UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TROY FLEMING et al                          CIVIL ACTION

VERSUS                                       NO: 20-1476

BAYOU STEEL BD HOLDINGS II                   SECTION: "J"(4)
LLC, et al

## ORDER & REASONS

Before the Court is a *Motion for Summary Judgment* **(Rec. Doc. 92)** filed by
Bayou Steel BD Holdings II, LLC and Black Diamond Capital Management, LLC
(collectively "Defendants"); an opposition (Rec. Doc. 97) filed by Troy Fleming, Ronnie
Millet, Jarrod Nabor, Davarian Ursin, and Charles Ziegeler (collectively "Plaintiffs");
a reply (Rec. Doc. 104) by Defendants; and a surreply (Rec. Doc. 109) by Plaintiffs.
Having considered the motion, legal memoranda, record, and applicable law, the
Court finds that the motion should be granted.

## FACTS AND PROCEDURAL BACKGROUND

This case arises from an alleged violation of the Worker Adjustment and
Retraining Notification (WARN) Act by Defendants. Plaintiffs claim that they did not
receive notice before BD LaPlace, LLC, d/b/a Bayou Steel Group closed the Bayou
Steel mill, its corporate headquarters, and related facilities on October 1, 2019, in
violation of the WARN Act. Plaintiffs assert that Defendants, Bayou Steel BD
Holdings II, LLC and Black Diamond Capital Management, LLC, are liable for Bayou
Steel's violation of the WARN Act as a "single employer."

In order to understand Plaintiffs' single employer argument, the ownership structure of Bayou Steel, where Plaintiffs worked, must be explained. In spring of 2016, a non-defendant private equity fund known as Black Diamond Opportunity Fund IV, LP ("Opportunity Fund IV") acquired Bayou Steel. Subsequently, the ownership structure of Bayou Steel was established as follows. Bayou Steel became BD LaPlace, LLC, d/b/a Bayou Steel Group (hereinafter referred to as "Bayou Steel"), which is owned by Bayou Steel Investment, LLC, which is owned by Bayou Steel BD Holdings, LLC. These three non-defendant entities have jointly filed for bankruptcy in the District of Delaware. *In re Bayou Steel BD Holdings, L.L.C., et al*, No. 19-12153 (KBO) (Bankr. D. Del.). Bayou Steel BD Holdings, LLC is owned by Defendant Bayou Steel BD Holdings II, LLC ("BD Holdings II"), which is a holding company with no employees owned by non-defendant Opportunity Fund IV. Throughout BD LaPlace's ownership of the Bayou Steel mill, a non-defendant entity affiliated with Black Diamond known as Black Diamond Commercial Finance, LLC provided a total of $21 million in loans to BD LaPlace. Finally, Defendant Black Diamond Capital Management, LLC ("BDCM") is a privately held investment management firm that provides oversight and support to its portfolio of companies invested in by Black Diamond's affiliated private equity funds, such as the aforementioned Opportunity Fund IV.

BDCM appointed three of its professionals to serve on BD LaPlace's six-member Board of Directors (the "Board"), appointed one of BDCM's directors as Vice President of BD LaPlace, and offered strategic advice and support to BD LaPlace.

Defendants provided the following demonstrative exhibit to explain the ownership

structure of Bayou Steel. (Rec. Doc. 8-2).

<u>**DEMONSTRATIVE EXHIBIT**</u>



In response to Plaintiff's allegation that BDCM and BD Holdings II act as a

single employer with Bayou Steel, Defendants filed a Motion for Summary Judgment

(Rec. Doc. 8) arguing that there is insufficient evidence to establish single employer

liability. The Court denied that motion after a finding that there were genuine issues

of material fact regarding four of the five factors in the single employer liability test,

including the all-important de facto control factor. (Rec. Doc. 58). Now, nine months

after the Court denied their motion, Defendants file the instant Motion for Summary

Judgment seeking a finding that Plaintiffs lack sufficient evidence to proceed to trial

on their theory that Defendants should be treated as Plaintiffs' employer under the

WARN Act.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399. Additionally, in a case set to be determined by a bench trial, the court has "somewhat greater discretion to consider what weight it will accord the evidence." *Jones v. New Orleans Reg'l Physician Hosp. Org., Inc.*, 981 F.3d 428, 433 (5th Cir. 2020).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out

specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See*, *e.g.*, *id.* at 325; *Little*, 37 F.3d at 1075.

## DISCUSSION

The WARN Act requires covered employers to provide employees with at least sixty days' notice before a plant closing or a mass layoff. 29 U.S.C. § 2102(a). An employer who fails to comply with the WARN Act is liable to each employee for back pay and benefits for up to sixty days, in addition to attorney's fees. § 2104(a). Defendants argue that they are not liable for Bayou Steel's violation of the WARN Act because Bayou Steel and Defendants are separate entities.

As a general rule, parent companies are not liable for the actions of their subsidiaries. *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998). However, Plaintiffs argue that Defendants are liable for Bayou Steel's alleged violation of the WARN Act as a "single employer." In determining whether a parent or entity is liable as a single employer under the WARN Act, courts utilize a five-factor test created by the Department of Labor. 20 C.F.R. § 639.3(a)(2). The five factors are: "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations."[1] *Id.*; *Administaff Companies, Inc. v. New York Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457 (5th Cir. 2003). Additionally, Defendants argue

---

[1] In the Order & Reasons denying Defendants' first *Motion for Summary Judgment* (Rec. Doc. 58), the Court held that Bayou Steel was not dependent on Defendants for its operations for purposes of the fifth factor so the fifth factor will not be addressed in the present Order & Reasons.

Delaware law governs in conjunction with the DOL factors to determine whether the outside directors lacked "independence" to make their own decisions. (Rec. Doc. 92-1, at 13). Specifically, Defendants contend that Delaware's "business judgment rule" applies and establishes "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." (*Id.* at 14) (quoting *Aronson v. Lewis*, 472 A.2d 805, 814 (Del. 1984)). The DOL five factor test, Defendants assert, does not provide any standard for assessing a director's independence or competence to make corporate decisions at issue in this case, but relevant state law does. (Rec. Doc. 104, at 2). Therefore, the first question before the Court is whether it should apply Delaware law to an evaluation of WARN Act liability.

## I.   DELAWARE'S BUSINESS JUDGMENT RULE IN THE CONTEXT OF WARN

First, the Court does not disagree with Defendants' contention that Louisiana choice of law rules would apply Delaware law to this case if the question were a typical one of veil piercing or corporate structure. "Louisiana courts look to the state of incorporation not just when deciding issues involving piercing, which as noted above is a close relative of the single business enterprise theory, but also when deciding more general questions of corporate structure." *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 647 (5th Cir. 2002). However, before the Court is not a typical corporate law case but a WARN Act liability case, and this is not the

first court to evaluate the question of whether other laws or tests should apply in the evaluation of WARN Act liability.

The Third Circuit, in *Pearson v. Component Technology Corporation*, analyzed the application of the following in the context of WARN Act liability: state law traditional veil piercing theories, the "integrated enterprise" test, and direct liability. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 477 (3d Cir. 2001). After evaluating these tests, the court found that "although the importation of state law standards into federal law is permissible when state law is deemed to effectuate federal policy, state veil-piercing standards hardly seem likely to do so when such standards may generate inconsistency in an area of law that has always been characterized by insistence on uniformity." *Id.* at 489. "The use of state law standards also has the potential to permit '[t]he policy underlying a federal statute' to be 'defeated by . . . an assertion of state power.'" *Id.* (quoting *Anderson v. Abbott*, 321 U.S. 349, 365 (1944)). Therefore, the Third Circuit held that "the most prudent course is to employ the factors listed in the Department of Labor regulations themselves. This approach not only has the virtue of simplicity . . . but also allows for the creation of a uniform standard of liability for the enforcement of a federal statute." *Id.* at 489–90. Moreover, the court reasoned that "the DOL factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind and, unlike traditional veil-piercing and some of the other theories, focus particularly on circumstances relevant to labor relations." *Id.* at 490.

7

Although *Pearson* was concerned with state veil piercing laws, and this Court is concerned with Delaware's business judgment law, the Court finds that *Pearson's* reasoning applies here. The application of Delaware's business judgment rule has the potential to permit the policy underlying the WARN Act to be defeated by an assertion of Delaware state law power. The WARN Act was created with a focus on protecting workers, their families and communities, and this focus is in contrast to Delaware's more director friendly business judgment rule. Thus, the Court declines to apply Delaware state law and the business judgment rule.

## II.   THE DEPARTMENT OF LABOR FACTORS

The Court's initial denial of summary judgment turned on three main questions. First, whether the outside directors were truly independent. This finding is important for the second factor, common directors and officers, and the third factor, de facto exercise of control. Second, whether Bayou Steel and BDCM have common ownership. And third, whether there is unity of personnel policies emanating from a common source. The Court will address each question in turn.

### A.   THE INDEPENDENCE OF THE OUTSIDE DIRECTORS

It is undisputed that BD Holdings II is a holding company with no employees, and thus, it has no common directors or officers with Bayou Steel; however, three BDCM employees served as members of the Board. Philip Raygorodetsky, a BDCM managing director, served as chairman of the Board. Sahand Farahnak, another BDCM managing director, served as vice president of Bayou Steel and was also a director. James Hogarth, an employee of BDCM, also served as a director. The

remaining members of the Board (the "outside directors") were Bob Unfried and Terry Taft, experienced veterans in the metal industry, and Rob Archambault, a corporate turnaround expert with industry experience. Plaintiffs do not argue that BDCM employees occupied the majority of the Board, but instead, they argue that the outside directors were not independent. Specifically, Plaintiffs contend that the outside directors lacked the necessary information to act independently.

In August 2019, Farahnak and Raygorodetsky alerted Steven Deckoff, BDCM's founder and principal, that Bayou Steel needed $8 million to survive its financial situation. Deckoff approved a $1 million advance conditioned upon it being a secured loan. In September 2019, Deckoff twice visited Bayou Steel in order to discuss a plan developed by Bayou Steel's then-CEO, Mike Williams, to make Bayou Steel profitable through a significant financial commitment. During the second visit on September 18-19, Deckoff asked John Fontana, a BDCM senior executive, his opinion on whether Bayou Steel should be reorganized or liquidated. On September 20, Fontana recommended liquidation but also offered to lead Bayou Steel if Deckoff was willing to spend more to salvage the business through Black Diamond Commercial Finance, LLC. (Rec. Doc. 31-12, at 36). On September 22, Hogarth also sent Deckoff an analysis of debtor in possession financing that projects Bayou Steel's operating capacity, sales, and expenses in the event it entered a bankruptcy. (*Id.* at 106). In response to Fontana's e-mail, Deckoff stated that he did not want to put any more money into Bayou Steel. (*Id.* at 36).

On September 22, Black Diamond's in-house counsel contacted a financial advisor from Candlewood Partners, LLC and bankruptcy counsel from Polsinelli, PC. Later that day, a Board Meeting was held to discuss BDCM's likely unwillingness to continue to fund the business and recommend that the company retain a bankruptcy financial advisor and counsel to prepare for potential bankruptcy. (*Id.* at 106). The Board subsequently approved a motion to retain BDCM's recommended bankruptcy financial advisor and counsel, Candlewood and Polsinelli. (*Id.*). On September 27, Candlewood and Polsinelli presented to the Board concerning the company's financial condition and issues related to a potential bankruptcy. (Rec. Doc. 8-3, at 9). After the presentation, the Board voted to file for bankruptcy with all BDCM affiliated directors abstaining from the decision. (*Id.* at 10).

In their second motion for summary judgment, Defendants first contend that the outside directors had no affiliation with BDCM prior to their appointment to the Board. (Rec. Doc. 92-1, at 15). In Plaintiffs' previous Opposition, they argued that the outside directors were not independent because they received a very lucrative compensation package. Here, Defendants assert that the independent directors were compensated by Bayou Steel and not BDCM, and they did not rely on the compensation for their livelihood. (Rec. Doc. 92-1, at 15–16). Next, Plaintiffs previously contended that Unfried concerned himself with all aspects of Bayou Steel's business and Taft routinely visited Bayou Steel, which is unusual for directors. Moreover, Plaintiffs asserted that Unfried and Taft would report their findings to Farahnak and Raygorodetsky, but they would not share their reports with Bayou

Steel's management. Here, Defendants argue that there is nothing surprising or inappropriate about directors of a company reporting their findings and impressions to one another, and that Delaware law actually requires directors to engage in the oversight that Plaintiffs contend reflects a lack of independence. (Rec. Doc. 92-1, at 16–17). Defendants cite to an expert report that states that "[a]s a matter of ordinary and customary corporate governance policy and practice, the directors of a company are responsible for managing the affairs of the company . . . . Further, in navigating turbulent times, members of a board of directors are often called upon and *expected* to play a more involved role in the company's affairs." (Rec. Doc. 92-19, at 7–8) (emphasis in original). Finally, Defendants argue that the outside directors relied on advice from others and not BDCM in determining whether to have Bayou Steel file for bankruptcy. (Rec. Doc. 92-1, at 17). Defendants cite to the deposition of each independent director in which he testified that he had sufficient information to make an informed business judgement; was guided by independent professionals; and did not feel any pressure from BDCM. (Rec. Doc. 92-1, at 17).

In opposition, Plaintiffs argue that the outside directors lacked the necessary information to act independently. (Rec. Doc. 97, at 14). Specifically, Plaintiffs contend that the outside directors lacked the most basic knowledge of Bayou Steel's finances. (*Id.* at 15). Plaintiffs cite to the dwindling Board meetings between 2017 and 2019. (*Id.*). Prior to September 22, 2019, there were no Board meetings in 2019, save for a brief call to confirm the new CEO of Bayou Steel. (*Id.*). Moreover, the outside directors only received the July financials on September 20, 2019 and the June financials on

August 28, 2019. (*Id.*). It was not until the June financials were provided in August of 2019 that one of the outside directors learned of the $28 million loan from BDCM to Bayou Steel, and none of the outside directors knew that Bank of America had declared default under its financial arrangement or that Bayou Steel's vendors refused to continue to do business unless paid in advance. (*Id.* at 15–16). Further, each outside director testified that he was not aware that the conditions of Bayou Steel would require bankruptcy prior to the September 22, 2019 meeting. (*Id.* at 16). This lack of information, Plaintiffs aver, is in direct contrast to the detailed financial reporting and explanatory memos that were provided to Steve Deckoff, BDCM's founder and managing principal. (*Id.*).

Moreover, on September 21, the outside directors were informed of the September 22 meeting and, before the meeting, the outside directors were not aware of the purpose of the meeting or the bankruptcy preparations made by BDCM. (*Id.* at 17). Plaintiffs assert that the September 22 Board meeting lasted approximately one hour in which the three outside directors testified that they (1) learned of Bayou Steel's financial problems; (2) heard potential solutions; and (3) voted to hire Polsinelli as debtor's counsel and Candlewood as a financial advisor. (*Id.* at 17–18). Five days later, on September 27, Plaintiffs aver, after little to no communication with the outside directors during this time, the Board met again, and the outside directors voted to put Bayou Steel into bankruptcy. (*Id.*).

Finally, Plaintiffs cite to the depositions of each outside director who testified that he had no knowledge as to how or when it was decided that a mass layoff would

be imposed at the LaPlace plant. (*Id.* at 19). Plaintiffs assert that the coordination of the WARN Act notices, as described by Bayou Steel's HR Manager, Kristen Barney, show that the decision to terminate the employees had already been made prior to the September 27 meeting. *See generally* (Rec. Doc. 108). Barney was informed by at least the morning of September 25 that Bayou Steel would be filing for bankruptcy. (*Id.* at 3). From September 25 through September 27, Barney communicated with outside counsel and Polsinelli to get the WARN Act notices drafted and ready to be handed out. (*Id.* at 4–5). However, the decision was made to not disperse the WARN Act notices until September 30 based upon a call with Barney, Polsinelli, Ritesh Tanna, and James Hogarth. (*Id.* at 5). Notably, Tanna and Hogarth were BDCM employees. (*Id.*). This confirms, Plaintiffs argue, that BDCM knew of the bankruptcy and need to lay off the employees days before the outside directors ever made a decision, and BDCM directed both of these decisions. (*Id.* at 5).

### i.    Whether BDCM Directed the Illegal Employment Practice

Whether the outside directors acted independently or if BDCM directed their decisions speaks directly to the third factor, de facto control. "The core of this factor is whether one company was the decision-maker responsible for the employment practice giving rise to the litigation." *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008) (internal quotation marks omitted). It is "not intended to support liability based on a parent's exercise of control pursuant to the ordinary incidents of stock ownership." *Pearson*, 247 F.3d at 503.

This factor is the most heavily weighted because, if the evidence of de facto control is egregious, such evidence alone could be sufficient to warrant single employer liability. *Id.* The weight attributed to this factor is rooted in the text of the WARN Act, which only imposes liability on an "employer who orders a plant closing or mass layoff." 29 U.S.C. § 2104(a)(1); *see also Administaff,* 337 F.3d at 456. However, courts must be:

> scrupulous in [their] efforts to distinguish between situations in which a parent/lender has ultimately assumed responsibility for the continuing viability of a company (thus incurring liability for WARN Act violations) and situations in which the borrower has retained the ultimate responsibility for keeping the company active.

*Pearson*, 247 F. 3d at 505. Decisions analyzing single employer liability under the WARN Act have recognized that lenders and parent corporations may take steps to protect their investments without incurring liability. *See, e.g., id.* at 502 ("We do not intend to create a jurisprudence that discourages loans in general or rescues of troubled business enterprises in particular."). "[T]he dispositive question is whether a creditor is exercising control over the debtor beyond that necessary to recoup some or all of what is owed, and is operating the debtor as the de facto owner of an ongoing business." *Cleary v. Am. Capital, Ltd.*, 59 F. Supp. 3d 249, 258 (D. Mass. 2014) (quoting *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 150 (2d Cir. 2007)).

In *Cleary v. American Capital, Ltd.*, the court found that despite the "aggressive" actions of the creditor, the actions were ultimately consistent with those of a parent company or creditor to protect its investment. *Id.* These actions included "proposing and assisting the recruitment of 'new management,' and the ferreting out

14

of an accurate and complete understanding of the company books." *Id.* Moreover, a creditor may even propose "methods to improve [the borrower's] profitability," and may step up its "verification to keep track of [the borrower's] deteriorating financial condition" without incurring WARN Act liability. *See Adams v. Erwin Weller Co.*, 87 F.3d 269, 272 (8th Cir. 1996). However, the parent or creditor crosses into WARN Act liability when they direct "the allegedly illegal employment practice that forms the basis for the litigation." *Pearson*, 247 F.3d at 491. "Only when [the parent company or creditor] becomes so entangled with its borrower that it has assumed responsibility for the overall management of the borrower's business will the degree of control necessary to support employer responsibility under WARN be achieved." *Adams*, 87 F.3d at 272. This includes the parent or creditor terminating employment or filing for bankruptcy. *Cleary*, 59 F. Supp. 3d at 258.

In *In re Tweeter Opco, LLC*, the court held that the plaintiffs established de facto control by the creditor company with "significant indirect ownership interests" in the debtor when the head of the creditor company repeatedly called for reductions in the debtor's payroll to increase profits, ordered the terminations of the debtor's employees, and had its own inside counsel directly involved in terminating the debtor's employees. *See In re Tweeter Opco, LLC*, 453 B.R. 534, 542–45 (D. Del. 2011). Conversely, in *In re Consolidated Bedding*, the court held that the plaintiffs did not establish de facto control. *See generally, In re Consolidated Bedding*, 432 B.R. 115 (D. Del. 2010). Although the creditor company supervised much of the debtor's activities, and the creditor company's employees occupied seats on the debtor's board of

directors, the debtor remained a "separate business entit[y] that did not rely on the [creditor] company for day-to-day operations." *Id.* at 124.

Hence, the question arises as to whether BDCM was acting in its role as a private equity firm overseeing and managing its asset or as the "single employer" with Bayou Steel. Like the creditor company in *Tweeter* that had its own inside counsel directly involved in the terminations, BDCM's allegedly chosen debtor counsel, Polsinelli, worked with Bayou Steel's HR Manager on WARN Act notices. Notably, though, the Bayou Steel Board voted to hire Polsinelli as its debtor's counsel. Next, unlike the head of the creditor company in *Tweeter*, who called for reductions in the debtor's payroll to increase profits, Deckoff visited Bayou Steel to discuss a plan to make Bayou Steel profitable through a significant financial commitment. Deckoff was not directing personnel decisions but acting in his lender capacity to evaluate and assess his investment. Deckoff was not visiting to get "entangled" with the management decisions, but to keep track of Bayou Steel's deteriorating financial condition. Further, like the company in *Consolidated Bedding*, BDCM supervised many of Bayou Steel's activities, but Bayou Steel did not rely on BDCM for day-to-day operations (as found below in the fourth factor). Thus, it appears that although BDCM walked the fine line between a private equity firm "aggressively" managing an investment and an employer directing personnel and management decisions, it did not cross that line.

16

"Where there's smoke, there's fire" may be a well-established proverb, but the presence of the smoke alone is not enough in a motion for summary judgment. Here, Plaintiff has pointed to evidence that the outside directors did not know about Bayou Steel's financial condition before the September 22, 2019 meeting, but after it, they had been fully briefed. Moreover, the outside directors consulted their own, independent counsel in anticipation of filing for bankruptcy. Finally, Bayou Steel's own HR Manager, Kristen Barney, worked with Polsinelli, Bayou Steel's debtor counsel, to coordinate the WARN Act notices. Therefore, the Court finds that although Plaintiffs have pointed out inferences created by the record, they have not set out sufficiently specific facts that give rise to more than conclusory allegations, and there is no genuine issue of material fact.

### ii.    Benefit to Bayou Steel

The next part of the inquiry is the benefit of bankruptcy to Bayou Steel. It is a "well established principle that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998). Further, there is a presumption that the activity of the directors is on behalf of the subsidiary, which "is strongest when the act is perfectly consistent with the norms of corporate behavior" and weakest when an act appears to be "plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." *Id.* at 70 n.13. Thus, to expose a parent or affiliated company to single employer liability due to the directors' dual positions, a plaintiff must point to evidence that the directors were actually

17

acting in their capacity as a representative of the parent or affiliate rather than the subsidiary. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997). This evidence includes a showing of the benefit to the parent as a result of the adverse employment decision that is to the detriment of the subsidiary.

Although Defendants argue that the closing of Bayou Steel and filing for bankruptcy had no benefit to BDCM, Plaintiffs contend that BDCM had one main objective and benefit in mind from the Board's decision to declare bankruptcy: as a vehicle to oust the union. (Rec. Doc. 97, at 21). To prove this benefit to BDCM, Plaintiffs cite to emails from Farahnak.

First, Plaintiffs cite to an email from Farahnak in which he is looking to decertify Bayou Steel. (Rec. Doc. 97, at 21).

> At a minimum we get neutrality out. Best case we decertify. Decertification could take Bayou from a 5-6x EBITDA business to 7-8x with Nucor and SDI becoming real buyers. Right now we are at the mercy of Gerdau as the only real domestic buyer. Let's think about it and come up with a plan because it can lead to real $$ at exit."

(Rec. Doc. 31-12, at 358). Next, Plaintiffs cite to an email in which Farahnak states: "I want a recommendation on what we are going to try to get from the union and it needs to be a lot more than what was on the sheet. If we get turned down, so be it, but I'm not relying on one lawyers view of what is and isn't possible." (Rec. Doc. 97, at 21); (Rec. Doc. 97-3, at 65). Farahnak sent this in response to being advised by counsel that the union was unlikely to give up pay and benefits. (*Id.*). Finally, Plaintiffs cite to an email from Farahnak who directly asks counsel: "Can't we tell the union in bankruptcy that we are rejecting the contract and if they don't agree to come

out nonunion we'll just liquidate the assets?" (Rec. Doc. 97, at 22); (Rec. Doc. 97-3, at 44). After counsel told Farahnak this was akin to bad faith bargaining, Farahnak responded, "Why is it considered bargaining at all? We would be buying the assets only out of bankruptcy and rejecting the union contract. Same as any contract you would reject when you buy assets in a bankruptcy." (Rec. Doc. 97-3, at 44). Counsel then proceeded to have an associate research the following questions:

> 1. How long does the mill need to be shut down for to allow us to come back up non-union with less than 50% of the former employees?
> 2. Is there a mechanism where we enter into an equity or other agreement with the hourly employees where the equity is only valid as long as the mill stays non-union?
> 3. What were the circumstances around Steel Dynamics purchase of Kentucky Electric Steel assets out of BK? How long was Kentucky Electric idled for? Did it come back up non-union? Did they hire back former employees or just bring employees over from their other previously owned mills?

(*Id.*).

Here, Plaintiffs have pointed to emails that create only inferences of a benefit to BDCM at the detriment of Bayou Steel. Defendants, in reply, argue that this assertion "defies common sense" because when Bayou Steel filed for bankruptcy, Opportunity Fund IV's remaining equity in Bayou Steel, $30 million, was lost, and Opportunity Fund IV's over $31 million of subordinated loans were also outstanding. (Rec. Doc. 104, at 7). Filing for bankruptcy, Defendants contend, for the mere possibility of a chance to credit bid for Bayou Steel's assets simply makes no sense. Especially, Defendants assert, because the bid was subject to review by Bayou Steel's Board, consisting of just the outside directors, as well as the Court, who ultimately rejected the bid. (*Id.* at 8). Therefore, the Court finds that Plaintiff has failed to point

to evidence that the bankruptcy of Bayou Steel benefitted BDCM. Mere inferences based on three emails does not create a genuine issue of fact.

## B.   COMMON OWNERSHIP

There is no dispute that BD Holdings II was in the chain of ownership of Bayou Steel. Thus, the dispute is whether BDCM and Bayou Steel had common ownership. The common ownership factor "inquires as to whether a parent or related entity directly owns a separate corporate entity." *Butler v. Fluor Corp.*, 511 F. Supp. 688, 700 (D.S.C. 2021) (citations omitted). However, determining single employer liability under the WARN Act does not require a threshold showing of common ownership; it is simply one of the factors and circumstances considered. *Id.* at 699 (citing *Pearson*, 247 F.3d at 490).

First, Defendants argue there is no common ownership. Defendants cite to the corporate structure of the entities, through the demonstrative, *infra*, to show there is no common ownership. (Rec. Doc. 92-1, at 19). To corroborate the demonstrative, Defendants cite to the depositions of Deckoff and Farahnak who each testified that BDCM does not own any membership interest in Bayou Steel and is not the general partner of Bayou Steel. (*Id.*). Deckoff stated in his deposition that one hundred percent of Bayou Steel's equity was owned by Opportunity Fund IV, and BDCM owned two and a half percent of Opportunity Fund IV. (Rec. Doc. 92-7, at 3–4).

In opposition, Plaintiffs argue that Defendants place too much emphasis on the technical, corporate structure rather than reality. (Rec. Doc. 97, at 23). Specifically, Plaintiffs contend that BDCM, as a private equity firm, managed and administered

Opportunity Fund IV because the fund itself has no employees but is rather an investment vehicle. (*Id.*). Plaintiffs assert that it is well known that a private equity fund itself does not play any active management role in its portfolio. (*Id.*).

> While the private equity fund is the actual owner of the portfolio companies, the investors in a private equity fund have a purely passive role. The private equity firm is solely responsible for identifying acquisition targets, providing management services to any acquired companies (including by negotiating their financings), and, after a few years, selling them off again.

Elisabeth de Fontenay, *Private Equity Firms As Gatekeepers*, 33 REV. BANKING & FIN. L. 115, 123–24 (2013). Plaintiffs rely on this understanding of the relationship between private equity funds and private equity firms to assert there is common ownership. However, the common ownership factor requires direct ownership. What Plaintiffs argue with this lesson in corporate structure is more appropriate under the de facto control factor because Plaintiffs allege that the private equity firm (BDCM) controls the actions of the private equity fund (Opportunity Fund IV).

Next, Defendants argue that the memo and PowerPoint that Plaintiffs relied upon originally to create a genuine issue of material fact were drafts and "unartfully state[d]."[2] (Rec. Doc. 92-1, at 19). Defendants cite to the deposition of Deckoff, who testified this was "an incorrect statement," as did Farahnak when questioned about both documents. (*Id.*). In response, Plaintiffs cite to a Case Study of Bayou Steel Corporation authored by Gregory Schunk, an analyst for BDCM, that repeatedly cites

---

[2] In their first Opposition (Rec. Doc. 31) Plaintiffs cited to a power point generated by BDCM, which represents that "BDCM & affiliates" owned 100% of Bayou Steel Group. (Rec. Doc. 31-12, at p. 110). Plaintiffs also cited to another memorandum from BDCM, which states that BDCM owns 100% of Bayou Steel's equity through Black Diamond Opportunity Fund IV, LP. (*Id.* at p. 111)

to "BDCM's ownership" in reference to Bayou Steel while also stating that Opportunity Fund IV owns 100% interest of Bayou Steel. (Rec. Doc. 97, at 24). Plaintiffs assert that because both Opportunity Fund IV and BDCM are used interchangeably as "owner" of Bayou Steel, there is common ownership between Bayou Steel and BDCM. Here, Plaintiffs have attempted to create a genuine issue of fact by focusing solely on the words that BDCM chose to use in its own, internal Case Study. Therefore, Defendants have correctly pointed out to this Court that the evidence in the record is insufficient to show common ownership between BDCM and Bayou Steel, and thus, the Court finds there is no genuine issue of material fact as to the common ownership factor.

### C.     UNITY OF PERSONNEL POLICIES EMANATING FROM A COMMON SOURCE

Unity of personnel policies is present when the parent "had a particular interest in how the [subsidiaries'] policies were designed or issued specific directives to [the subsidiary] on the subject." *Pearson*, at 499. The unity of personnel factor requires the factfinder to weigh whether the parent or affiliated company influenced or directed policy decisions, not whether the policy decisions are normal for a corporation to take under the circumstances.

Defendants cite to the fact that Bayou Steel had its own bank account, computer service, and Human Resources department and set its own employment policies and procedures relating to compensation, retirement, health insurance, vacation, sick leave, and other benefits. (Rec. Doc. 92-1, at 20). In Plaintiffs' previous opposition, Plaintiffs cited to an e-mail from Raygorodetsky to his fellow directors, in

which he states that his "boss" (presumably Deckoff) approved his proposal to cut costs in a manner that reflects the tough financial situation that Bayou Steel was in. (Rec. Doc. 31-12, at 228-29). In this e-mail, Raygorodetsky elaborated that "we" planned to cut headcount, compensation, benefits, and any other advisable cuts to get Bayou Steel through its financial difficulties. (*Id.*). Subsequently, Bayou Steel implemented a retirement plan discontinuance, 401k match freeze, insurance plan changes, pay cuts, and a freeze on the incentive plan for some supervisors. Here, Defendants argue that in the email in which Raygorodetsky discusses cost cutting measures, he was acting as a Bayou Steel Board member with a legal duty to engage in the oversight of Bayou Steel, and that this email reflects activities consistent with his duty as a Board member. (Rec. Doc. 92-1, at 20).  Defendants contend that a single instance of what Plaintiffs characterize as direction from Raygorodetsky is not sufficient to establish that BDCM and Bayou Steel "function[ed] as a single entity with respect to [personnel] policies on a regular, day-to-day basis[.]" (*Id.*) (quoting *Pearson*, 247 F.3d at 490).

In opposition, Plaintiffs argue that Defendants re-urge the same argument as their first motion for summary judgment and merely shift gears to argue that all of Raygorodetsky's actions that created a genuine issue of material fact the first time were justified because his actions were that of a typical board member. (Rec. Doc. 97, at 24). Plaintiffs contend that this knowledge was not lost on the Court in the first motion for summary judgment when the Court found a genuine issue of material fact and, as such, the Court should do so again. (*Id.*).

In *Pearson*, the subsidiary put forth evidence that it, on a few occasions, sought the parent's "approval for decisions to institute bonus programs and to pay salaries in excess of $100,000." *Pearson*, 247 F.3d at 499. The court held that "such limited monitoring of compensation expenditures as part of a general loan agreement requiring oversight of [the subsidiary's] spending in a number of areas is not sufficient to demonstrate a 'unity of personnel *policies* emanating from a common source.'" *Id.* (emphasis in original). Moreover, the court found that even "the fact that [the parent] may have controlled the hiring and firing of the company's president and chief executive officer, and monitored the hiring of a few other high-level managers . . . simply is not enough to find a 'unity' of personnel 'policy.'" *Id.* at 500.

Here, unlike the parent company in *Pearson* that directed cost decisions on a few occasions, BDCM seems to have directed cost cutting measures only once. A handful of actions, let alone a single action, does not amount to the existence of a unified personnel *policy*. Moreover, the evidence that Raygorodetsky directed cost cutting measures is more appropriately considered under the de facto control factor. Hence, Plaintiffs have not created a genuine issue of material fact that there was a unified personnel policy between BDCM and Bayou Steel.

Therefore, Plaintiffs have failed to show that there is a genuine issue of material fact as to any of the Department of Labor factors, and thus, Defendants did not act as a "single employer" with Bayou Steel. Without this finding of single employer liability, Defendants cannot be liable to Plaintiffs for any real or alleged violation of the WARN Act.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' *Motion for Summary Judgment*

(Rec. Doc. 92) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Count I: Violation of the Federal

WARN Act is **DISMISSED with prejudice.**

New Orleans, Louisiana, this 17th day of February, 2022.


CARL J. BARBIER
UNITED STATES DISTRICT JUDGE