# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 27, 2023

Lyle W. Cayce
Clerk

—————————

No. 22-30260

—————————

Troy Fleming, Jarrod Nabor, Davarian Ursin, Charles Ziegeler, and Ronnie Millet, *on behalf of themselves and all other similarly situated*,

*Plaintiffs—Appellants*,

*versus*

Bayou Steel BD Holdings II L.L.C.; Black Diamond Capital Management L.L.C.,

*Defendants—Appellees*.

—————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-1476

—————————————————————

Before Smith, Clement, and Wilson, *Circuit Judges*.

Cory T. Wilson, *Circuit Judge*:

The Worker Adjustment and Retraining Notification (WARN) Act requires certain employers to provide affected employees with 60-days' notice before a plant closure or mass layoff. 29 U.S.C. § 2102(a). If an employer fails to comply, affected employees may sue the employer for backpay, benefits, and attorney's fees. *Id.* § 2104(a). But a plant closure often occurs simultaneously with an employer's bankruptcy, leaving little

likelihood that affected employees will be able to recover damages from their employer.  In such circumstances, plaintiffs sometimes seek WARN Act damages from other corporations that are legally distinct from but related to the defunct employer.  Such companies may be found liable only if they acted as a "single employer" with the plaintiffs' employer.

This is one such suit.  BD LaPlace, LLC, doing business as Bayou Steel (Bayou Steel), operated a steel mill in LaPlace, Louisiana.  On September 30, 2019, without giving WARN Act notice, Bayou Steel terminated Plaintiffs' employment and closed the LaPlace mill where they worked.  The next day, Bayou Steel filed for bankruptcy.  Seeking to recover under the WARN Act, Plaintiffs initially filed a putative class action complaint against Bayou Steel in Delaware bankruptcy court.  Several months later, Plaintiffs dismissed that action and filed the instant class action in federal district court in Louisiana.

Rather than suing their employer Bayou Steel, Plaintiffs sued Bayou Steel BD Holdings II, LLC (the holding company that indirectly owned Bayou Steel) and Black Diamond Capital Management, LLC (a private equity firm that advised the fund that owned BD Holdings II).  Plaintiffs demanded a jury trial, which the district court denied, holding that the Seventh Amendment provides no right to a jury in WARN Act cases.  After discovery, Defendants sought summary judgment, which the district court granted. The district court determined that Defendants could not be held liable under the WARN Act because they did not act as a single employer with Bayou Steel.  Plaintiffs appealed, challenging both the denial of their jury demand and the summary judgment for Defendants.

We affirm the district court's denial of Plaintiffs' jury demand.  We also affirm the district court's grant of summary judgment for BD Holdings II.  But we conclude there is an issue of material fact about whether Black

No. 22-30260

Diamond Capital Management was a single employer with Bayou Steel. We accordingly reverse and remand on that question.

## I.

Bayou Steel was a producer of steel products. BD LaPlace, LLC was the employer of Bayou Steel's officers and employees. BD LaPlace, LLC's ownership structure, in turn, was fairly complex, involving labyrinthine relationships among a half-dozen corporate entities, as illustrated by the following chart included in the district court's summary judgment opinion:



We thus begin by briefly sketching the history of Bayou Steel's corporate structure.

Black Diamond Opportunity Fund IV, LP (BD Fund IV) is a private equity fund structured as a limited partnership.[1] In April 2016, BD Fund IV

_____

[1] Most partners in BD Fund IV are institutional investors, but Defendant Black Diamond Capital Management also owns 2.5% of BD Fund IV.

indirectly acquired BD LaPlace, LLC and its parent company BD Bayou Steel Investment, LLC from ArcelorMittal Bayou Acquisition, LLC. At the time of the acquisition, BD Fund IV created two new companies—Bayou Steel BD Holdings, LLC (BD Holdings) and Bayou Steel BD Holdings II, LLC (BD Holdings II)—to hold the membership units of the newly acquired companies. Both BD Holdings and BD Holdings II are single-member LLCs without any employees. BD Holdings II is a Defendant in this case.

The other Defendant is Black Diamond Capital Management (BDCM), a private equity fund that acted as an investment advisor to BD Fund IV. In this role, BDCM offered oversight and strategic support to the portfolio of companies in which BD Fund IV invested, including Bayou Steel.

Bayou Steel had been managed by its prior owner ArcelorMittal and had no internal management team of its own. After BD Fund IV acquired Bayou Steel, BDCM helped set up Bayou Steel's new management structure. BDCM selected Robert Simon, an experienced steel industry executive, as Bayou Steel's new Chief Executive Officer. Alton Davis, a former Bayou Steel employee, became President and Chief Operating Officer, and Dan Lay was hired from a Bayou Steel competitor to be Bayou Steel's Vice President of Sales. BDCM also helped establish a five-member Board of Directors by recommending potential board members to Bayou Steel's new management team for approval. BDCM recommended two BDCM employees (Sahand Farahnak and Phil Raygorodetsky) and three non-BDCM employees.[2] Bayou Steel management approved all of them. The BDCM employees served as

—————————————

[2] Those individuals were Robert Unfried, Terry Taft, and Robert Archambault. Unfried was Executive Vice President of Finance and Administration for Commercial Metals Company. Taft was President and CEO of Metalwest and TAD Metals, member companies of O'Neal Industrial Group, a Bayou Steel customer. Archambault was a partner with Platinum Equity, which managed Ryerson, Inc., another Bayou Steel customer.

chairs of the audit and compensation committees, and Raygorodetsky was appointed Chairman of the Board. Later, with management's approval, a third BDCM employee (James Hogarth) joined the Board, increasing its size from five to six members.

Soon after the acquisition, BD Fund IV contributed $5 million to Bayou Steel's balance sheet. Bayou Steel also received revolving loans up to $75 million from Bank of America and SunTrust to provide capital for its day-to-day operations. As security, the banks received a first-priority lien against all of Bayou Steel's assets, excluding its real estate. With these cash infusions, Bayou Steel ostensibly had sufficient funds for its day-to-day operations.

By the fourth quarter of 2017, however, fluctuations in the steel market threw Bayou Steel into financial turmoil. BDCM helped Bayou Steel implement cost-cutting measures, including a reduction in force, changes to employee benefits and compensation, and renegotiation of vendor contracts. Bayou Steel's CEO Simon offered another source of Bayou Steel's troubles: He believed that he had been unable to do his job because he had been micromanaged by Raygorodetsky and Farahnak, the BDCM employees on Bayou Steel's Board. In November 2017, Simon was removed from his position.

In December 2017, Black Diamond Commercial Finance (BDCF), a loan originator affiliated with BDCM, loaned $15 million to Bayou Steel, and provided an additional $30 million line of credit. Bayou Steel used these funds for long-term capital improvements and additional working capital when liquidity was constrained.

After Simon's removal in November 2017, Bayou Steel lacked a CEO. It was not until spring 2019 that Bayou Steel hired a new CEO, Michael Williams, who had previously been president of the domestic subsidiaries of

a Finnish steel manufacturer.  Before long, Williams also felt frustrated by the intense oversight of the mill's management by BDCM.

Around the time Williams was hired, Bayou Steel got a new cash infusion to keep it afloat.  BD Fund IV lent Bayou Steel $13 million, and the banks increased the limit on Bayou Steel's line of credit.  By August 2019, however, the banks notified Bayou Steel that changes to their calculation methods put Bayou Steel into a technical default on its loan.  To help buoy Bayou Steel's finances, on August 30, 2019, BD Fund IV loaned $1 million to Bayou Steel, and BDCF increased Bayou Steel's line of credit to $40 million.

On September 5, 2019, Bayou Steel Director Sahand Farahnak and Stephen Deckoff, a representative of BD Fund IV's General Partner, visited Bayou Steel to meet with the company's management team.  After the visit, BD Fund IV made a $2 million loan to Bayou Steel, which was used to pay critical vendors.

A little less than two weeks later, on September 18 and 19, Farahnak and Deckoff again visited Bayou Steel.  Meeting with them, Williams outlined additional capital expenditures, repairs, and new hires necessary to turn Bayou Steel around.  Nonetheless, Deckhoff decided that BD Fund IV would make no further investment.

On September 22, the Bayou Steel Board of Directors met via phone and discussed the bank loan default, BD Fund IV's decision, and Bayou Steel's options.  The three independent directors expressed surprise regarding Bayou Steel's dire financial straits.  Confronted with reality, the Board decided to hire Polsinelli law firm and Candlewood Partners, both recommended by BDCM, to advise Bayou Steel on restructuring options.

In the meantime, Bayou Steel's HR manager Kristen Barney consulted with an attorney at another law firm about the steps necessary to

notify employees of the planned closure of Bayou Steel's LaPlace mill and to carry out the associated WARN Act notices. The initial plan was to hand out WARN Act notices on the afternoon of September 27. But the HR manager, two BDCM employees, and Polsinelli determined the timeline was too rushed and decided to delay notice of terminations until September 30.

On September 27, the banks notified Bayou Steel that they were accelerating Bayou Steel's loans, demanding total repayment of Bayou Steel's $41.2 million bank balance by the end of the month. After receiving this notice, the Board met again. At that meeting, Polsinelli and Candlewood advised the Board that Bayou Steel "had no alternatives other than filing for bankruptcy."

After that meeting, the three independent Directors consulted with their own counsel. They then determined that Bayou Steel should be taken into bankruptcy because the lack of access to capital made Bayou Steel's continued operations impossible. On September 30, the three independent directors signed a formal resolution to put Bayou Steel into bankruptcy; the BDCM-employed Board members abstained. The same day, employees in LaPlace were being notified of the mill's closure and the termination of their employment.

While the Board voted to put Bayou Steel into bankruptcy, the Directors deny that they made the decision to close the mill or lay off its employees. Rather, the Board members contend that Bayou Steel's officers made the decision. Bayou Steel's CEO asserts he first learned of the mill's closure and associated layoffs when he read about it in the newspaper.

Regardless, on October 1, 2019, Bayou Steel filed for Chapter 11 bankruptcy in Delaware. *See In re Bayou Steel BD Holdings LLC, et. al.*, No.

19-12153 (Bankr. D. Del.).[3] Two days later, Plaintiffs, steelworkers who had been employed at the LaPlace mill, filed a putative class action against Bayou Steel in Delaware bankruptcy court. *See Fleming et al. v. Bayou Steel BD Holdings, LLC, et al.*, Adv. Pro. No. 19-50392 (Bankr. D. Del.). They alleged WARN Act violations and sought damages. On May 19, 2020, the Plaintiffs dismissed that action and filed the instant case in federal district court in Louisiana. There, they brought a class action against BD Holdings II and BDCM, alleging that the Defendants were liable for WARN Act damages to Plaintiffs and a class of employees laid off when the LaPlace mill closed. Plaintiffs demanded a jury trial.

Concurrently with answering the complaint, Defendants moved for summary judgment. They denied liability on the ground that Plaintiffs had failed to establish a genuine dispute of material fact about whether Defendants could be liable under the WARN Act as a single employer with Bayou Steel under the applicable five-factor test. The district court denied the motion, concluding that Plaintiffs had created a genuine dispute over four of the five factors enumerated by the Department of Labor and our caselaw. *See* 20 C.F.R. § 639.3(a)(2);[4] *see also Administaff Companies, Inc. v. N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457–58 (5th Cir. 2003) (applying § 639.3(a)(2) factors).

The Plaintiffs filed a motion for class certification, which the district court granted.

---

[3] BD LaPlace LLC, BD Bayou Steel Investment LLC, and Bayou Steel BD Holdings LLC filed for bankruptcy together.

[4] The one factor where the Plaintiffs had initially failed to establish a genuine dispute of material fact was the fifth, dependency of operations. *See* 20 C.F.R. § 639.3(a)(2)(v).

No. 22-30260

A couple months later, Defendants moved to strike Plaintiffs' jury-trial demand, contending that the Seventh Amendment does not provide a jury-trial right for WARN Act claims. The district court granted Defendants' motion, adopting the Sixth Circuit's reasoning in *Bledsoe v. Emery Worldwide Airlines, Inc.*, 625 F.3d 836 (6th Cir. 2011), to conclude that the WARN Act concerns equitable rights and thus does not fall within the Seventh Amendment's ambit.

Soon after the denial of Plaintiffs' jury demand, Defendants moved for summary judgment a second time. This time, the district court granted Defendants' motion. Relying on its prior order denying a jury trial, the district court exercised the "somewhat greater discretion" it enjoys in reviewing summary judgment motions in cases set for bench trial. The district court dismissed the case.

Plaintiffs moved for reconsideration, urging that the district court erred in finding no genuine issue of material fact about whether BDCM exercised de facto control over Bayou Steel. The court denied the motion. In doing so, the court acknowledged and corrected a factual error made in its prior summary judgment order. Otherwise, the district court determined that nothing changed the outcome of its analysis of de facto control.

Plaintiffs timely appealed.

## II.

The WARN Act requires employers to provide notice before a plant closure or mass layoff.[5] Specifically,

---

[5] The WARN Act's requirements are subject to exceptions not at issue in this appeal. *See* 29 U.S.C. § 2102(b); *see also, e.g.*, *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1281 (5th Cir. 1994) (outlining the "faltering company" exception and "unforeseen business circumstances" exception).

No. 22-30260

[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order—

(1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and

(2) to the State or entity designated by the State to carry out rapid response activities under section 3174(a)(2)(A) of this title, and the chief elected official of the unit of local government within which such closing or layoff is to occur.

29 U.S.C. § 2102(a). The WARN Act creates a cause of action against employers who fail to comply with its requirements. *Id.* § 2104(a). Offending employers are liable to each affected employee for back pay, *id.* § 2104(a)(1)(A); benefits, *id.* § 2104(a)(1)(B); and attorney's fees, *id.* § 2104(a)(6). Liability is "calculated for the period of the violation, up to a maximum of 60 days." *Id.* § 2104(a)(1).

Plaintiffs seek to recover from Defendants under the WARN Act for Bayou Steel's failure to give proper notice. It is undisputed that Bayou Steel did not provide the required notice to Plaintiffs before terminating their employment and closing the LaPlace steel mill. Instead, the disputes are (A) whether the Plaintiffs are entitled to a jury trial,[6] and (B) whether Defendants may properly be liable for Bayou Steel's violation.

_____

[6] Defendants contend that we should not reach the jury-trial issue, characterizing it as a "red herring." They reason that "this case was not tried without a jury" because the district court dismissed it at the summary judgment stage. Not so. Plaintiffs appeal not only the district court's final judgment but also "all orders that, for purposes of an appeal, merge into [that] judgment." FED. R. APP. P. 3(c)(4). The district court's denial of Plaintiffs' jury demand was not otherwise appealable and thus merges with the judgment

No. 22-30260

## A.

Whether there is a right to a jury trial in a WARN action is a matter of first impression in this court.[7] Reviewing the issue *de novo*, *see Provident Life & Accident Ins. Co. v. Sharpless*, 364 F.3d 634, 639 (5th Cir. 2004), we conclude the WARN Act carries no such right.

We begin by looking to the WARN Act itself to determine "whether a construction of the statute is fairly possible by which the constitutional question may be avoided." *Tull v. United States*, 481 U.S. 412, 417 n.3 (1987) (quotations, citations, and brackets omitted); *see Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."). But the WARN Act is silent on whether plaintiffs enjoy a right to trial by jury in actions brought under it. *See Bledsoe*, 635 F.3d at 841 ("The WARN Act neither speaks directly to the question of whether there is a right to jury trial nor otherwise makes clear an intention in this regard."). "Given this statutory silence, we must answer the constitutional question presented." *Tull*, 481 U.S. at 417 n.3.

The Seventh Amendment provides a right to a jury trial in "Suits at common law, where the value in controversy shall exceed twenty dollars."

---

for purposes of appeal. Moreover, the district court relied upon its jury-trial ruling in granting summary judgment, expressly using the relaxed standard that applies to review summary judgment motions in cases to be determined via bench trial. The jury issue is squarely presented in this appeal.

[7] Plaintiffs point out that this court has previously upheld a jury verdict in a WARN action. *See Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 393 (5th Cir. 2000). But the parties in *Hollowell* did not challenge whether the plaintiffs had a jury-trial right under the Seventh Amendment. Thus, our affirming the verdict there does not bear on the question before us now.

No. 22-30260

U.S. CONST. amend. VII. "Suits at common law" are suits regarding legal, as opposed to equitable, rights. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (citing *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 447 (1830)). The Seventh Amendment thus "extends to causes of action created by Congress," so long as "legal rights are at stake." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564-65 (1990).

To determine whether a statutory cause of action concerns legal rights, we employ a two-pronged approach, looking to "both the nature of the issues involved and the remedy sought." *Id.* "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Id.* (quoting *Tull*, 481 U.S. at 417–18). "Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* The second prong is "more important than the first." *Granfinanciera*, 492 U.S. at 42.

**1.**

There was no cause of action for failing to give prior notice of termination of employment in 18th-century England. So we "look for an analogous cause of action that existed in the 18th century to determine whether the nature" of the WARN Act's statutory right of action is legal or equitable. *Terry*, 494 U.S. at 566.

In *Staudt v. Glastron*, we considered a different issue: what statute of limitations period applies to WARN Act claims. 92 F.3d 312 (5th Cir. 1996). Our decision there is nonetheless relevant here insofar as *Staudt* ruled out analogies to some common-law causes of action. Specifically, we determined that "[a] WARN action is not particularly analogous to either" "contract claims" or "actions on debt." *Id.* at 316. Following *Staudt*, we exclude analogies to those kinds of actions at the outset.

No. 22-30260

Our case law, however, leaves open what analogy might apply.[8] Only one of our sister circuits has answered the question. In *Bledsoe*, the Sixth Circuit suggested that a WARN action is analogous to a claim for a "breach of an employer's fiduciary duty," historically an equitable cause of action. 635 F.3d at 842. The Sixth Circuit did not explain further, but it cited the district court's analysis approvingly. *Id.* (citing *Bledsoe v. Emery Worldwide Airlines, Inc.*, 258 F. Supp. 2d 780, 793 (S.D. Ohio 2003)). The *Bledsoe* district court reasoned:

> A better comparison might be made to a breach of fiduciary duty cause of action, the fiduciary duty being that of an employer to safeguard the welfare of its employees by giving them at least 60 days' notice of any impending mass layoff or plant closing, or, in the absence thereof, remuneration for the number of working days for which it should have given advance notice, but did not. If viewed in this light, the employer might be seen as a trustee, and the relief sought, that being back pay and benefits for a limited, definite time period, might be viewed as funds wrongly managed or withheld by a trustee. Damages, therefore, would be in the nature of restitution, an equitable remedy.

258 F. Supp. 2d at 793 (citing *Terry*, 494 U.S. at 567 ("observing that 'an action by a trust beneficiary against a trustee for breach of fiduciary duty' was 'within the exclusive jurisdiction of the courts of equity'")).

---

[8] In *Staudt*, we said that "the predicate for liability under WARN" "is comparable to a tort claim in that both require a 'wrongful' act by the defendant." *Id.* at 316. But the predicate for liability, i.e., the action giving rise to liability, is distinct from the statutory right of action that provides a path to remedy that liability. In prong one of our jury-right analysis, we look to the latter, not the former. Accordingly, as discussed above the line, while *Staudt* rules out certain analogies, that case does not determine an applicable analogy for the WARN Act's statutory action.

The Sixth Circuit's fiduciary-duty analogy is at least in part supported by our precedent. In *Borst v. Chevron Corp.*, we held claims for wrongly withheld ERISA benefits analogous to "breach of fiduciary duty" because ERISA "plaintiffs seek restitution of money allegedly wrongly held by the defendants." 36 F.3d 1308, 1324 (5th Cir. 1994). And the WARN Act's statutory cause of action encompasses ERISA benefits that employees would have received had their employer given the required 60-days' notice. *See* 29 U.S.C. § 2104(a)(1)(B); *id.* § 1002(3). So that aspect of a WARN action seems plainly comparable to a claim for breach of fiduciary duty. Further, "it seems unlikely that Congress would have intended plaintiffs to be entitled to a jury's determination of lost ERISA benefits under the WARN Act where they would not be entitled to one under ERISA itself." *Bledsoe*, 258 F. Supp. 2d at 798. At the very least, a WARN action is "intertwined with the equitable relief of ERISA benefits," which is itself comparable to equitable breach of fiduciary duty. *Id.*; *see Borst*, 36 F.3d at 1324.

Plaintiffs, by contrast, suggest an analogy to quasi-contract. They point to *United States v. ERR, LLC*, where this court determined that the government's action to recoup oil-spill cleanup costs was analogous to a quasi-contract claim. 35 F.4th 405 (5th Cir. 2022). Given that "quasi-contract actions sound in law, not equity," we concluded in *ERR* that the government's action "support[ed] a right to a jury." *Id.*; *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 716–17 (1999).

Quasi-contract actions are based on unjust enrichment. *SEC v. Hallam*, 42 F.4th 316, 340 (5th Cir. 2022) (citing *Schall v. Camors*, 251 U.S. 239, 254 (1920)). It looks to whether "benefit accrued" to the defendant "as a result of" plaintiff's actions such that the plaintiff ought to recover from the defendant. *Schall*, 251 U.S. at 254. The quasi-contract analogy made sense in *ERR*, where the defendant company received a benefit from the government's cleanup of its spill, and the government sought to recover

reimbursement of its cleanup costs. *ERR*, 35 F.4th at 412. "That is a quintessential quasi-contract action." *Id.*

The analogy breaks down, though, because a WARN action does not resemble quasi-contract. In our case, Plaintiffs did not confer a benefit upon Defendants, nor are the employees suing for reimbursement of costs related to that benefit. Plaintiffs contend the analogy nonetheless works, arguing that a WARN Act "plaintiff recovers damages in the form of monetary restitution, just as in an action for quasi-contract." True, quasi-contract actions seek monetary restitution. *Id.* But so do breach-of-fiduciary-duty actions. *See Borst*, 36 F.3d at 1324 (In "claims for breach of fiduciary duty, plaintiffs seek restitution of money[.]"). Thus, any resemblance between the remedy available in quasi-contract and WARN Act damages is not decisive.

At the end of the day, we are persuaded that the fiduciary duty analogy espoused in *Bledsoe* is more apt. Viewing the WARN action through historical analogues then, it appears to be equitable and not legal in nature. Of course, the first prong's inquiry into 18th-century English causes of action can be "abstruse" and "difficult to apply." *Ross v. Bernhard*, 396 U.S. 531, 538 n.10 (1970). And the second prong of the jury-trial question—looking to the remedy—is "more important." *Granfinanciera*, 492 U.S. at 42; *cf. Tull*, 481 U.S. at 421 (declining to "rest [the Court's] conclusion" on the historical question and proceeding instead to the second inquiry).

**2.**

The first prong addressed, we turn to the "more important" question of remedy. *Granfinanciera*, 492 U.S. at 42. To support a right to trial by jury, the available remedy must be legal rather than equitable. *Id.* at 41.

No. 22-30260

The WARN Act provides damages for "aggrieved employee[s] who suffer[] an employment loss as a result of" their employer's failure to provide the required notice. 29 U.S.C. § 2104(a)(1).[9] Employers are liable for

> (A) back pay for each day of violation at a rate of compensation not less than the higher of—
>
> > (i) the average regular rate received by such employee during the last 3 years of the employee's employment; or
> > (ii) the final regular rate received by such employee; and
>
> (B) benefits under an employee benefit plan . . . including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

*Id.* § 2104(a). An employer's total liability is "calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer." *Id.*[10]

---

[9] We discuss only the remedies available to employees who do not receive proper notice under the WARN Act. The law provides different remedies for employers' failure to give proper notice to affected units of local government. *See* 29 U.S.C. § 2102(a)(2) (requiring notice to "chief elected official of the unit of local government within which [a covered] closing or layoff is to occur"); *id.* § 2104(a)(3) (providing for "a civil penalty of not more than $500 for each day of such violation").

[10] That amount

shall be reduced by—

(A) any wages paid by the employer to the employee for the period of the violation;

(B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and

(C) any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution

"If an employer . . . proves to the satisfaction of the court that [its failure to give notice] was in good faith and that the employer had reasonable grounds for believing that the [failure] was not a violation of [the WARN Act,] the court may, in its discretion, reduce the amount of the liability[.]" *Id.* § 2104(a)(4). And "the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs." *Id.* § 2104(a)(6). No injunctive relief is available under the WARN Act. *See id.* § 2104(b) ("[A] Federal court shall not have authority to enjoin a plant closing or mass layoff.").

Put simply, the WARN Act provides for money damages. "Generally, an action for money damages was the traditional form of relief offered in the courts of law." *Terry*, 494 U.S. at 570 (internal quotations omitted). But that does not mean that "any award of monetary relief must *necessarily* be 'legal' relief." *Id.* Rather, courts "have characterized damages as equitable when they are restitutionary" or "intertwined with injunctive relief." *Id.* at 570–71. WARN Act damages are not intertwined with injunctive relief, as such relief is specifically precluded. 29 U.S.C. § 2104(b). So we consider only whether the damages at issue are restitutionary.

Remedies are restitutionary when they are "intended simply to extract compensation or restore the status quo," whereas legal remedies are "intended to punish culpable individuals." *Tull*, 481 U.S. at 422. WARN Act damages seek to put aggrieved employees "in the same position they would have been had the violation never occurred." *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1283 (5th

---

pension plan) on behalf of and attributable to the employee for the period of the violation.

*Id.* § 2104(a)(2).

Cir. 1994). Liability is calculated based on "the number of work days in the violation period rather than the number of calendar days," because the remedy should reflect what an affected employee "would have received had the plant remained open, or had the layoff been deferred until the conclusion of the notice period." *Id.* at 1284 (quoting S. Rep. No. 62, 100th Congr. 1st Sess. 24 (1987)). Thus, damages available under the WARN Act seek to extract proper compensation for impacted employees rather than punish their employer. They are restitutionary. *See Tull*, 481 U.S. at 422.[11]

Moreover, "the WARN Act places the entire amount of the liability in the district court's discretion." *Id.* at 844; *see* 29 U.S.C. § 2104(a)(4). Where "the [d]istrict [c]ourt retains substantial discretion whether or not to award backpay . . . , the nature of the jurisdiction which the court exercises is equitable." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 443 (1975) (Rehnquist, J., concurring).

Plaintiffs again offer *ERR*, which reminds "that restitution can sound in either law or equity." 35 F.4th at 412. True enough. "Indeed, the earliest proceedings in common law courts were restitutionary in nature." *SEC v. Hallam*, 42 F.4th 316, 340 (5th Cir. 2022) (alterations, quotations, and citations omitted)). As we explained in *ERR*, "[r]estitution *at law* involved 'cases in which the plaintiff could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him.'" 35 F.4th at 413 (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). But equitable restitution is

_____

[11] Our conclusion is consistent with this court's decisions that other back pay remedies are restitutionary. *See Wilson v. Belmont Homes, Inc.*, 970 F.2d 53, 55–56 (5th Cir. 1992 (Title VII claim for back pay is equitable); *see also Harkless v. Sweeny Indep. Sch. Dist.*, 427 F.2d 319, 323–24 (5th Cir. 1970) (§ 1983 claim for back pay is equitable).

different: "[R]estitution *in equity* ordinarily required identification of particular property or funds in the wrongdoer's possession traceable to the victim." *Id.*

The WARN Act provides for equitable restitution. As our sister circuit explained in *Bledsoe*:

> what the Plaintiffs herein are seeking is not compensation for the damages flowing from their discharge, but a reimbursement of those salaries and benefits, calculated on a per diem basis, which were due to them on the day they were laid off, in lieu of [their employer]'s having given them proper notice of their layoffs, and which have to this point been wrongfully withheld from them.

635 F.3d at 843. Because the remedy provided is equitable in nature, Plaintiffs are not entitled to a jury trial of their WARN Act claims.

## B.

Because we conclude there is no right to a jury trial under the WARN Act, Plaintiffs' instant action would be decided via bench trial. That in turn affects the standard of review that applies to the district court's summary judgment on Plaintiffs' WARN Act claims.

As usual, we review the court's summary judgment *de novo*. *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 255 (5th Cir. 2020). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.'" *Ahders v. SEI Priv. Tr. Co.*, 982 F.3d 312, 315 (5th Cir. 2020) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)).

Ordinarily, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Guzman v. Allstate Assurance Co.*, 18 F.4th 157 (5th Cir. 2021) (At summary judgment, the court usually may not invade the province of the jury by "evaluat[ing] the credibility of witnesses, weigh[ing] the evidence, or resolv[ing] factual disputes.") (citations omitted). But in a bench trial, the judge acts as "trier of fact" in place of the jury. *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991) (quoting *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978)). In view of that, "the district court has somewhat greater discretion to consider what weight it will accord the evidence" when considering summary judgment. *Id.* at 397. Specifically, "even at the summary judgment stage a judge in a bench trial has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result." *Id.* at 398. And "the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved." *Id.* at 397 (emphasis omitted).

Keeping the district court's enhanced leeway in mind, we turn to review its summary judgment for Defendants in today's case.

## C.

The WARN Act imposes liability on the "*employer who orders* a plant closing or mass layoff" without giving the required notice. 29 U.S.C. § 2104(a)(1) (emphasis added). To be liable, Defendants must have been Plaintiffs' employer, and they must have ordered the closing or layoff at the LaPlace steel mill. *See Administaff*, 337 F.3d at 456–58. We start with the latter.

Defendants urge that Plaintiffs have failed to create a genuine issue about whether Defendants ordered the mill closure. Though the district court did not consider that question, we could reach it if it provides a ground for affirmance, was raised below, and is supported by the record. *Id.* at 456. But Plaintiffs assert that we should not consider this argument because Defendants failed to raise it before the district court.[12]

Plaintiffs are right. A single line in Defendants' answer pled an affirmative defense that they "did not make the decision to conduct the alleged mass layoffs and/or plant closings[.]" However, in the district court, Defendants neither developed the argument beyond this one line nor raised it in their summary judgment motions. "If a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court." *United States v. Scroggins*, 559 F.3d 433, 447 (5th Cir. 2010) (quoting *FDIC v. Mijalis*, 15 F.3d 1314, 1326–27 (5th Cir. 1994)). Defendants failed to do so. We will not consider this argument further.[13]

So, WARN Act liability in this case turns on whether Defendants are considered to have been Plaintiffs' employer. Of course, Bayou Steel, not Defendants, actually employed Plaintiffs. Thus, Defendants were not

_____

[12] Though Plaintiffs raised this objection in their reply brief, we may consider it. While we usually decline to consider arguments presented for the first time in a reply brief, we will consider such arguments when they "seek simply to invoke" our rule "that arguments not raised in the district court cannot be asserted for the first time on appeal." *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 427 n.29 (5th Cir. 2003).

[13] In any event, this analysis would be highly similar to the analysis on the de facto control element of the five-factor test. *See infra* Part II.C.3. After all, that element looks to "whether the business in question has specifically directed the allegedly illegal employment practice that forms the basis for the litigation"—here, the closing of the LaPlace mill and termination of Plaintiffs' employment without proper notice. *Administaff*, 337 F.3d at 457–58 (alterations adopted) (citation omitted).

No. 22-30260

Plaintiffs' employer in the usual sense. Plaintiffs nonetheless contend that Defendants may be held liable for Bayou Steel's violation of the WARN Act as a "single employer."

The WARN Act does not address when a related entity may be held liable under a single employer theory. But the Department of Labor (DOL) has done so via regulation. *See* 20 C.F.R. § 639.3(a)(2); *see also* 29 U.S.C. § 2107 (authorizing such regulations). The DOL regulations specify "factors to be considered" in determining whether a related entity is so intertwined with the employer that the two may be considered a single employer, such that the related entity may be liable for the actual employer's WARN Act violation. 20 C.F.R. § 639.3(a)(2). Those five factors are:

> (i) common ownership,
>
> (ii) common directors and/or officers,
>
> (iii) de facto exercise of control,
>
> (iv) unity of personnel policies emanating from a common source, and
>
> (v) the dependency of the operations.

*Id.*; *see Administaff*, 337 F.3d at 457–58.[14] "[A]pplication of th[e] factors is a 'factual' question rather than a 'legal' one." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 496 (3d Cir. 2001).

---

[14] The DOL regulations purport not to depart from "existing legal rules" treating "subsidiaries . . . as separate employers or as part of the parent or contracting company depending on the degree of independence from the parent." 20 C.F.R. § 639.3(a)(2). Based on this language, other courts have debated whether to apply these five factors or use veil-piercing tests drawn from other contexts. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 483–91 (3d Cir. 2001) (reviewing courts' divided positions). Our court has adopted the five DOL factors for the single-employer question without considering other veil-piercing tests. *See Administaff*, 337 F.3d at 457–58; *cf. Hollowell*, 217 F.3d at 385, 388 (applying the DOL factors to the single-employer question but using Louisiana corporate-

No. 22-30260

As an initial matter, Plaintiffs make no arguments about how the factors apply to BD Holdings II. They instead focus their attention on BDCM. Consequently, we find that Plaintiffs have waived any challenge to the grant of summary judgment in favor of BD Holdings II, *see Rollins v. Home Depot USA*, 8 F.4th 292, 397 (5th Cir. 2021), and we affirm the district court's judgment in favor of BD Holdings II. We hereafter survey the DOL factors only as to BDCM.

**1.**

First, common ownership. Plaintiffs admit that "BDCM did not technically 'own' BD Fund IV," the ultimate owner of Bayou Steel.[15] Nor did BDCM and BD Fund IV or BDCM and Bayou Steel have common owners. Instead, Plaintiffs suggest we should focus on "the reality that BDCM had complete control over" BD Fund IV, rather than "the formal corporate structure." They urge that BDCM's control of BD Fund IV is sufficient to support "an inference of ownership for summary judgment purposes." The district court rejected this argument, concluding that "the common ownership factor requires direct ownership." We reject it too.

Ownership entails possession, not mere control. *See Own*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To rightfully have or possess as property; to have legal title to."). Similarly, the common ownership factor

_____

veil principles to evaluate whether an individual owner may be responsible for corporation's WARN Act violation). We consider the debate closed in this circuit and follow the DOL factors for the single-employer question without resorting to general veil-piercing principles. *Accord Pearson*, 247 F.3d at 489–90 ("[T]he most prudent course is to employ the factors listed in the [DOL] regulations themselves. This approach not only has the virtue of simplicity . . . , but also allows for the creation of a uniform standard of liability for the enforcement of a federal statute.").

[15] BDCM held a 2.5% investment stake in BD Fund IV. The remainder of BD Fund IV was held by institutional investors.

requires more than control. Otherwise, this factor would collapse into the de facto control factor. *See Pennington v. Fluor Corp.*, 19 F.4th 589, 596-99 (4th Cir. 2021) (finding companies that merely contracted with one another did not meet common ownership factor; delineating ownership question from de facto control); *cf.* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) (counseling to avoid "interpretation[s] that [would] cause[]" one provision "to duplicate another" or otherwise "have no consequence"). Financial or indirect control may be relevant, but only to the extent that it is probative of who actually "owned" Bayou Steel. *See Pearson*, 247 F.3d at 497; *see also Pennington*, 19 F.4th at 597–99 (distinguishing common ownership question from de facto control where parent company or lender effectively becomes the decisionmaker causing WARN Act violation).[16] Whatever BDCM's degree of control over Bayou Steel's operations, that alone does not satisfy the common ownership factor of the single-employer test.

At the same time, we do not agree with the district court that this factor requires direct ownership. Rather, there may be circumstances where a significant financial relationship short of direct ownership nonetheless amounts to common ownership. *See Pearson*, 247 F.3d at 497 (finding common ownership where there was reason to believe that recent stock transfers to insiders without consideration "were not bona fide transfers of ownership"). But there are no allegations of fraudulent transfer of title or other circumstances here that would give rise to common ownership absent actual direct ownership.

_____

[16] Of course, Plaintiffs' arguments about BDCM's practical control over Bayou Steel are relevant to the de facto control factor, discussed *infra*.

Plaintiffs point to the loan made by BDCF to Bayou Steel, analogizing to *In re Tweeter OPCO, LLC*. 453 B.R. 534, 542 (Bankr. D. Del. 2011) (finding common ownership where a corporation "arranged for [others] to pay off Wells Fargo, the former senior lender, and become 'first in line as lender'").[17] But the facts in *Tweeter* do not bear out any useful analogy. As the district court pointed out, neither BDCM nor BDCF held first-priority liens over Bayou Steel's assets—Bank of America and SunTrust did. While BDCM likely helped arrange the loan with its affiliate BDCF, BDCM did not at the same time pay off Bank of America and SunTrust such that BDCF could assume their first-in-line position, as occurred in *Tweeter*. In any event, the *Tweeter* court determined that "[f]inancial control itself is sufficient to satisfy the common ownership factor." 453 B.R. at 542. We thus hesitate to say that we would find common ownership as that court did, even if the facts matched perfectly.

The district court correctly found no dispute of material fact regarding whether BDCM and Bayou Steel had common ownership. This factor weighs against a finding of liability for BDCM.

**2.**

Second, common directors and/or officers. Everyone concedes that BDCM and Bayou Steel did not have common officers. The parties instead focus, as the district court did, on BDCM's and Bayou Steel's common directors. The district court determined that, while "three BDCM

---

[17] Defendants contend that Plaintiffs waived any *Tweeter*-based arguments by failing to raise them in opposition to Defendants' second motion for summary judgment. While "[a] party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal," *Rollins*, 8 F.4th at 397, the Plaintiffs interposed *Tweeter* in the district court in opposition to the Defendants' first motion for summary judgment. Because it was presented to the district court and pressed on appeal, we may consider this argument.

employees served as members of [Bayou Steel's] Board," they never "occupied the majority of the Board." Plaintiffs do not dispute this. Rather, they contend that the members of the Board not employed by BDCM were not truly independent.

According to the Third Circuit, "[t]his factor . . . looks to whether the two nominally separate corporations: (1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company." *Pearson*, 247 F.3d at 498. Put simply, this factor "look[s] only to whether some of the same individuals comprise (or, at some point did comprise) the formal management team of each company." *Id.*

We agree with this articulation, which leads us to reject Plaintiffs' argument. Plaintiffs essentially urge a rule not that directors be "common," but rather truly independent, in order to hurdle this factor. This conflicts with the text of the DOL regulation, which specifically looks to "common directors and/or officers." 20 C.F.R. § 639.3(a)(2). While independence may be relevant to other factors,[18] commonality—not independence—is the touchstone of this factor. Hence, we agree with the district court that there is no genuine dispute of material fact as to this factor. BDCM and Bayou Steel had common directors, though never a majority of the Board. They had no common officers. This lack of commonality weighs against liability for BCDM, though not heavily so.

_____

[18] E.g., the independence of the management of Bayou Steel is relevant to whether BDCM exercised de facto control over Bayou Steel.

No. 22-30260

### 3.

In contrast with the others, the third factor, de facto control, is the hinge of this case. This factor "'consider[s] whether the [defendant] has specifically directed the allegedly illegal employment practice that forms the basis for the litigation.'" *Administaff*, 337 F.3d at 457–58 (quoting *Pearson*, 247 F.3d at 491). The allegedly illegal employment practice here was the closure of the LaPlace mill and termination of Plaintiffs' employment without WARN Act notice. So we consider whether BDCM "specifically directed" the mill closure and layoffs. *Id.* at 458.

The district court found no genuine dispute of material fact as to de facto control because the plaintiffs had pointed to "smoke alone" without finding the "fire," i.e., actual evidence that BDCM directed the closure of the plant without WARN Act notice.

To be sure, Plaintiffs have not produced evidence conclusively showing BDCM was responsible for the WARN Act violation at the LaPlace mill. But just as surely, someone made the decision. Bizarrely, Bayou Steel's own officers and directors deny knowing who decided to close the LaPlace mill. At the same time, the record shows that BDCM was intimately involved in any number of significant decisions at Bayou Steel, so much so that Bayou Steel's CEO felt micromanaged by BDCM employees who were "going around [him] constantly[.]" Viewed in the light most favorable to Plaintiffs, the evidence gives rise at least to an inference that BDCM directed the LaPlace mill closure and layoffs just as it made other decisions at Bayou Steel. In other words, based on the evidence before us, a reasonable factfinder could find that BDCM directed the mill closing without giving the required notice. Accordingly, there is a genuine dispute of material fact as to Defendant's de facto exercise of control.

The district court relied on the independent directors' testimony that they "consulted their own, independent counsel in anticipation of filing for bankruptcy." But the focus is on the mill closing and the layoffs, not the bankruptcy. *Id.* at 457. The directors' due diligence in filing for bankruptcy may well be probative of who decided to close the plant, but it is not determinative. After all, many companies remain going concerns and emerge from bankruptcy to continue operations for years to come. Thus, while the directors' deposition testimony is perhaps relevant, it does not exactly (i.e., indisputably) answer the crucial question: whether BDCM "specifically directed" the closing of the LaPlace mill without proper notice. *Id.* at 458.

Same with the fact that "Bayou Steel's own HR Manager, Kristen Barney, worked with Polsinelli, Bayou Steel's debtor counsel, to coordinate WARN Act notices." This may show that Barney and Polsinelli knew about both the impending closure of the mill and the need for WARN Act notices, but it fails to indicate—much less beyond any dispute—who actually made the decision to close the mill without providing proper notice.

Reviewing the record, we are left with the inexplicable fact that Bayou Steel's own officers and directors say they did not order the termination of Bayou Steel's employees, juxtaposed with voluminous evidence that BDCM micromanaged business decisions at the LaPlace mill. Squaring this evidentiary circle is the task of the finder of fact, not the stuff of summary judgment. The district court erred in finding no material fact dispute as to whether BDCM exercised de facto control over Bayou Steel's decision to close the mill and order Plaintiffs' layoffs.[19]

_____

[19] After doing so, the district court analyzed whether there "was a benefit to [BDCM] as a result of the . . . closing of Bayou Steel and filing for bankruptcy." It is unclear to which factor this "benefit" analysis was relevant—or whether the district court was effectively overlaying a new factor on top of the five DOL factors. We discern no

**4.**

"With respect to the fourth factor," unity of personnel policies emanating from a common source, we look to whether Bayou Steel and BDCM "had separate responsibilities regarding personnel issues." *Administaff*, 337 F.3d at 458. Put another way, we look to "whether the nominally separate corporations actually functioned as a single entity with respect to [personnel] policies on a regular day-to-day basis." *Pearson*, 247 F.3d at 490. For example, we have found a unity of personnel policies where "employees of the various entities were all covered by the same benefits plan," and "[e]mployees who moved from one entity to the another did not experience a change in coverage." *Hollowell*, 217 F.3d at 389.

The district court concluded that there was no unity of personnel policies between BDCM and Bayou Steel because directing personnel policies on a handful of occasions does not rise to unity of personnel policies. We agree. To be sure, BDCM prompted Bayou Steel to adopt a slew of cost-cutting measures, many of which affected personnel policies.[20] But that falls

_____

support for the relevance of this inquiry in our precedent. The cases the district court relied on for its "benefit" analysis were not WARN Act cases; rather, they analyzed parent-subsidiary liability. *See United States v. Bestfoods*, 524 U.S. 51, 58 (1998) (discussing "when the corporate veil can be pierced under state law"); *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 777 (5th Cir. 1997) (discussing when "a parent corporation and its subsidiary may be regarded as a 'single employer' under the [Age Discrimination in Employment Act]"). As we have noted, such principles are not substitutes for the WARN Act DOL factors in our circuit. *See supra* n.14.

[20] Defendants urge us to disregard much of the evidence relevant to these cost-cutting measures because Plaintiffs "elected to rely on one email" before the district court and cannot "attempt, on appeal, to point to evidence that was not raised before the district court." Defendants are wrong. Both before the district court and on appeal, Plaintiffs point to freezing of 401(k) benefits; an elimination and reinstatement of performance bonuses; changes made to employee healthcare benefits; and management time recordation and remote work policies.

far short of showing that Bayou Steel and BDCM "actually functioned as a single entity with respect to [personnel] policies on a regular day-to-day basis." *Pearson*, 247 F.3d at 490. This factor weighs against liability for BDCM.

## 5.

Finally, dependency of operations. The district court found that Bayou Steel was not dependent upon the Defendants for the continuance of its operations because BDCM and Bayou Steel did not commingle finances. On appeal, the Plaintiffs no longer dispute this factor. *See Scroggins*, 599 F.3d at 447 ("An appellant abandons all issues not raised and argued in its initial brief on appeal.").

## 6.

We have previously "decline[d] to decide the relative importance of the five WARN factors[.]" *Hollowell*, 217 F.3d at 389. In this instance, we must, because only the third factor, de facto control, potentially weighs in favor of liability for BDCM.

The Third Circuit found the question of de facto control to be of such importance that "liability might be warranted even in absence of the other factors." *Pearson*, 247 F.3d at 504. We agree. This factor comes closest to the text of the WARN Act, which imposes liability on an "employer who orders a plant closing or mass layoff." 29 U.S.C. § 2104(a)(1). After all, the de facto control factor looks to who "specifically directed the allegedly illegal employment practice," here, closing the LaPlace mill without giving proper notice to Plaintiffs. *Administaff*, 337 F.3d at 457–58. Thus, if BDCM "specifically directed" the closing of the mill without proper notice, the company may be liable for Bayou Steel's WARN Act violation even absent the other factors.

Therefore, our conclusion that there is a genuine dispute of material fact as to whether BDCM exercised de facto control over Bayou Steel's decision to close the mill and order Plaintiffs' layoffs is enough to reverse the district court's summary judgment on the issue of WARN Act liability. The complex and lengthy record in this case includes a wealth of evidence relevant to this inquiry. The district court, as finder of fact, is best positioned to consider it in the first instance—or to determine that additional discovery is warranted. We remand for the district court to revisit this issue and decide, should it find that BDCM exerted de facto control over Bayou Steel, whether "liability [is] warranted even in absence of the other factors." *Pearson*, 247, F.3d at 504.

## III.

We AFFIRM the district court's conclusion that there is no right to a jury trial under the WARN Act. We also AFFIRM the district court's grant of summary judgment to BD Holdings II. But the district court erred in granting summary judgment to BDCM because there is a genuine dispute of material fact as to whether BDCM exercised de facto control over Bayou Steel's decision to close its LaPlace steel mill and order Plaintiffs' layoffs. Accordingly, we REVERSE in part and REMAND for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; REMANDED.