# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 11, 2026

Lyle W. Cayce
Clerk

—————————

No. 24-30291

—————————

Troy Fleming, *On behalf of themselves and all other similarly situated*; Jarrod Nabor, *On behalf of themselves and all other similarly situated*; Davarian Ursin, *On behalf of themselves and all other similarly situated*; Charles Ziegeler, *On behalf of themselves and all other similarly situated*; Ronnie Millet, *On behalf of themselves and all other similarly situated*,

*Plaintiffs—Appellants*,

*versus*

Black Diamond Capital Management L.L.C.,

*Defendant—Appellee*.

———————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-1476

———————————————————

Before Graves, Higginson, and Wilson, *Circuit Judges*.

Per Curiam:[*]

After reversing summary judgment, our court remanded for the district court to resolve one question: Did Black Diamond Capital

—————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-30291

Management specifically direct the closing of the Bayou Steel plant, causing the mass layoff of its employees without sufficient notice under the Worker Adjustment Retraining Notification (WARN) Act? After a bench trial, the district court answered: No. We AFFIRM.

## I. Background

Bayou Steel[1] operated a steel plant in LaPlace, Louisiana. *Fleming v. Bayou Steel BD Holdings II L.L.C.*, 83 F.4th 278, 284 (5th Cir. 2023). In September 2019, it terminated 300 employees without proper notice under the WARN Act. *Fleming v. Bayou Steel BD Holdings II LLC* ("*Bench Trial Ord.*"), No. 20-1476, 2024 WL 1621128, at *3 (E.D. La. Apr. 15, 2024). The company filed for bankruptcy the next day. *Fleming*, 83 F.4th at 284.

In 2020, a putative class of terminated employees (plaintiffs) sued Bayou Steel and Black Diamond—a private equity firm that owned Bayou Steel through a subsidiary. *Id.* at 287. The district court granted defendants summary judgment. *Id.* at 287–88. But our court reversed for plaintiffs' claims against Black Diamond, and we remanded for further factual development to resolve whether Black Diamond specifically directed the plant's closure. *Id.* at 299–300. After a limited bench trial, Black Diamond prevailed. *Bench Trial Ord.*, 2024 WL 1621128, at *3. Plaintiffs appealed again.

## II. Standard of Review

On an appeal from a bench trial, we review factual findings for clear error and legal issues de novo. *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015). A factual finding is clearly erroneous if we are "left with the definite and firm conviction that" the trial court is

_____

[1] BD LaPlace, LLC (d/b/a Bayou Steel).

mistaken. *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). Indeed, "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *In re Luhr Bros., Inc.*, 157 F.3d 333, 338 (5th Cir. 1998) (citation modified).

## III. Discussion

### A. The only remaining issue is whether Black Diamond exercised de facto control over Bayou Steel's decision to close the plant.

Under the WARN Act, an employer generally must give 60 days' notice before a mass layoff or plant closing. 29 U.S.C. § 2104(a)(1). If it does not, it may be liable for the employees' consequent losses, such as backpay. *Id.* No party disputes that Bayou Steel failed to give plaintiffs required notice before closing the plant. *Fleming*, 83 F.4th at 288.

Instead, the question is whether plaintiffs may hold Black Diamond liable for "Bayou Steel's violation of the WARN Act as a single employer." *Id.* (citation modified); *see id.* at 294–300. The WARN Act "imposes liability [only] on the '*employer who orders* a plant closing or mass layoff' without giving the required notice." *Id.* at 294 (quoting 29 U.S.C. § 2104(a)(1)). Bayou Steel, not Black Diamond, actually employed plaintiffs. *Fleming*, 83 F.4th at 294. But Black Diamond may nevertheless be liable for Bayou Steel's WARN Act violations if the two acted as "a single employer." *Id.* at 295.

The single-employer inquiry focuses on five factors, promulgated as Department of Labor regulations. *Administaff Cos., Inc. v. N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457 n.2 (5th Cir. 2003) (quoting 20 C.F.R. § 639.3(a)(2)). Those are: "(i) common ownership, (ii) common directors [or] officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. § 639.3(a)(2). In the previous appeal, we affirmed the district court's resolution of the other factors against plaintiffs. *Fleming*, 83

F.4th at 295–299. But a genuine dispute remained over the de facto control factor. *Id.* at 297–98.

That factor "considers whether the defendant has specifically directed the allegedly illegal employment practice." *Id.* at 297 (citation modified) (quoting *Administaff*, 337 F.2d at 457–58). We remanded for the district court to resolve whether Black Diamond "specifically directed the closing of the mill without proper notice." *Id.* at 299. And if so, "whether liability is warranted even in absence of the other factors." *Id.* (citation modified) (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 504 (3d Cir. 2001)).

## B. Finding no clear error, we affirm.

Plaintiffs now appeal judgment for Black Diamond. They maintain that the district court erred when it failed to find that Black Diamond "was in de facto control of the decision to terminate [plaintiffs]." Because this is a factual challenge, we review for clear error. *See Guzman*, 808 F.3d at 1036.

### *1. After Black Diamond acquired Bayou Steel, the plant failed.*

Mostly, the events leading up to the closure are not disputed. Black Diamond acquired Bayou Steel through a holding company in 2016. *Fleming*, 83 F.4th at 284. Beyond its own funding, Black Diamond secured Bayou Steel more funds, through revolving loans of over $75 million from outside lenders. These loans required Bayou Steel to keep $10 million in cash available to prevent default.

After the acquisition, Black Diamond changed Bayou Steel's board. Black Diamond installed three of its employees: Phil Raygorodetsky, Sam Farahnak, and James Hogarth. *Fleming*, 83 F.4th at 285. And it installed three "independent directors": Robert Unfried, Terry Taft, and Robert Archambault. *Id.* at 285 n.2.

Even with more funding, Bayou Steel floundered. Starting in 2017, steel-market fluctuations jeopardized the company's $10 million dollar reserve. *Id.* at 285–86. In 2018, an accident that damaged critical equipment at the plant compounded Bayou Steel's troubles. *Id.* Black Diamond responded with even more funding. *Id.* at 286. But by June 2019, Bayou Steel was losing about $3.5 million every month.

In late September 2019, closure became inevitable. Black Diamond's principal, Steven Deckoff, visited the plant twice. After these visits, he "concluded that [the Bayou Steel] investment wasn't viable." By September 22, he decided not to invest any more in the plant. The same day, the Bayou Steel board met to discuss the company's dire financial condition. At the meeting, the board learned that without additional funds, Bayou Steel would run out of money. So the board voted to retain outside bankruptcy counsel.

Bayou Steel prepared for the inevitable mass layoff. By September 25, its HR Director, Kristen Barney, drafted a WARN notice to the plant's employees. This initial draft reflected a November layoff date that complied with the WARN Act. But by the 27th, the outside lenders accelerated their loans and demanded that Bayou Steel pay more than $40 million by September 30.

By then, the Bayou Steel board voted to file for bankruptcy. The Black Diamond-affiliated board members (Raygorodetsky, Farahnak, and Hogarth) abstained and then resigned. The loan acceleration and impending bankruptcy meant that Bayou Steel would not make payroll. So Barney updated the WARN notice to reflect that layoffs would begin on September 30. Plaintiffs were laid off that day.

No. 24-30291

*2. Because the record is unclear who specifically directed the plant's closure, we find no clear error.*

While these facts are undisputed, the parties dispute who specifically directed the plant's closure. As plaintiffs concede, "There is no direct evidence showing who made the . . . decision." We agree.

Every Black Diamond director testified that the board did not decide to close the plant. Hogarth testified that he "did not participate in the decision to terminate [the] employees. That would have been a decision made by management on the advice of it[s] advisors." Farahnak testified that at the end of the September 27 meeting, he "knew there would be a bankruptcy filing" within several days but did not know there would be a mass layoff. Raygorodetsky did not "recall" a "discussion of a mass layoff" at any board meeting.

Nor could two of the three independent directors recall who directed the closing. Unfried testified that he did not "recall a vote that specifically terminated the employees" and instead attributed the "final decision" to Bayou Steel's corporate officers. Taft denied any involvement in the process of terminating the employees.

Independent board member Archambault was the only director who could recall anything about who ordered the closure—but his testimony was inconsistent. He claimed that bankruptcy counsel recommended the closure and then the board voted to approve it. But later, he testified that he only learned of a layoff after the Black Diamond board members resigned. Still later, he claimed that he could not recall the decision's timing.

Put simply, there is no "clear evidence of what actually occurred between the 25th and the 27th" to expedite the plant's closing. *Bench Trial Ord.*, 2024 WL 1621128, at *3. Faced with this paucity of evidence, plaintiffs asked the district court to infer from Black Diamond's frequent control over

6

Bayou Steel's decisions that it specifically directed the plant's closing. But the court disagreed, instead finding only that "closing of the plant was inevitable without further loans, which neither Black Diamond nor [other lenders] were willing or required to provide." *Bench Trial Ord.*, 2024 WL 1621128, at *4. "[O]nce that became inevitable, the independent directors . . . apparently made the ultimate decision to close the plant and immediately begin terminations." *Id.*

On clear error review, we cannot "discount the district court's reasonable factual inferences from the evidence." *United States v. Fletcher*, 882 F.3d 151, 156 (5th Cir. 2018). And the district court reasonably inferred that Black Diamond did not specifically direct the plant's closing.

Granted, some evidence suggests that Black Diamond exercised control over Bayou Steel's decisions near the closing. Indeed, Black Diamond might be the likeliest culprit; the fact that Bayou Steel's "own officers and directors" still "deny knowing who decided to close the [plant]" is "bizarre." *Fleming*, 83 F.4th at 297. But the lack of direct evidence is glaring, and the circumstantial evidence is inconclusive. Even though Black Diamond directed some of Bayou Steel's decisions, it does not necessarily follow that it specifically directed others. We cannot reverse merely because the district court rejected plaintiffs' inference.

Plaintiffs protest that, "surely, someone made the decision," relying on our previous opinion. *See id*. At summary judgment, we "dr[ew] all reasonable inferences in [plaintiffs'] favor." *See, e.g.*, *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Because plaintiffs' control theory was a reasonable inference, we allowed the case to proceed. *Fleming*, 83 F.4th at 297–98. But at the bench trial, plaintiffs bore the ultimate burden to show "who specifically directed" the plant's closure. *See id*. The district court found they could not carry it.

*Administaff* does not compel a different outcome. Plaintiffs claim that *Administaff* "supports a reversal" because "the record evidence only supports the inference that [Black Diamond] directed the plant's closure." But *Administaff* holds only that a WARN Act defendant cannot specifically direct an illegal employment decision that it did not make. 337 F.3d at 457–58. The case does not support the inverse, which plaintiffs press, that a WARN Act defendant *must* be liable if it is connected to the illegal decision or has advance knowledge of it. *See id.*

*　　*　　*

Plaintiffs' burden was to deliver fire, but they offer only smoke. Without direct evidence, the district court sifted through the circumstantial evidence and found it lacking. That Black Diamond specifically directed Bayou Steel's closure is a reasonable inference. But the district court declined plaintiffs' inference, and we are not firmly convinced it was wrong.

The dissent seeks to rewrite *Fleming* to cast the de facto control inquiry beyond a specific direction to close the plant. But the law of the case doctrine bars us from "reexamin[ing] . . . on a subsequent appeal . . . an issue of law or fact decided on a previous appeal." *United States v. Agofsky*, 516 F.3d 280, 283 (5th Cir. 2008) (citation modified). In *Fleming*, a previous panel reduced the de facto control inquiry in this case to whether Black Diamond specifically directed the plant's closing. 83 F.4th at 297–98, 300. That binds us, so only a factual question remains, which we review for clear error. Finding none, we AFFIRM.

No. 24-30291

Stephen A. Higginson, *Circuit Judge*, dissenting:

Black Diamond Capital Management ("BDCM"), a private equity firm based in Connecticut, acquired BD LaPlace, LLC ("Bayou Steel"), a steel mill in a small, industrial Louisiana town. Approximately three years after the acquisition, Plaintiffs—300 Bayou Steel employees—were abruptly laid off without proper notice, and Bayou Steel filed for bankruptcy. Plaintiffs filed suit asserting liability against BDCM under 29 U.S.C. § 2102(a) (the "WARN Act"). I write separately to express my concern that our instruction to the district court in *Fleming v. Bayou Steel BD Holdings II,* LLC, 83 F.4th 278 (5th Cir. 2023) (*Fleming I*) to determine "whether BDCM 'specifically directed' the closing of the LaPlace mill without proper notice" has resulted in an unintended shift in our WARN Act jurisprudence. *Id.* at 298. The required analysis pertaining to the "functional assessment of the amount of control involved," has been displaced rendering it nearly impossible for plaintiffs to show de facto control absent the culpable party specifically admitting fault.[1] Because the record before us contains overwhelming evidence that BDCM exercised de facto control over Bayou Steel's operations and personnel, including the decision to close the mill and effect the layoff of these hundreds of employees without adequate notice, I respectfully DISSENT.

I.

After the district court dismissed Plaintiffs' claims on summary judgment, we remanded because there was, "a genuine dispute of material fact as to whether BDCM exercised de facto control over Bayou Steel's

---

[1] *Pearson v. Component Technology Corp.*, 247 F.3d 471, 495 (3rd Cir. 2001).

decision to close its LaPlace steel mill and order Plaintiffs′ layoffs." *Fleming I*, 83 F.4th at 300.

The central question in cases involving affiliate liability under the WARN Act requires identifying the "employer." That is distinct from the far narrower, and here impossible, assignment we gave the district court, who dutifully said, "the ultimate, and only, issue before the Court is 'who specifically directed the closing of the LaPlace mill without proper notice.'" *Fleming v. Bayou Steel BD Holdings II, LLC*, 2024 WL 1621128 at *1 (E.D.La. April 15, 2024) (*Fleming II*). In *Fleming I*, we highlighted "the inexplicable fact that Bayou Steel′s own officers and directors say they did not order the termination of Bayou Steel's employees, juxtaposed with voluminous evidence that BDCM micromanaged business decisions at the LaPlace mill." *Fleming I*, 83 F.4th at 298. Instead of resolving this contradictory evidence, however, the district court, following our remand order to look for "specific direction," held only that BDCM would not be liable "merely for its decision refusing to make additional loans to Bayou Steel." *Fleming II*, 2024 WL 1621128 at *4.

In answering our remand instruction, to determine "whether BDCM 'specifically directed' the closing of the mill without proper notice," *Fleming I*, 83 F.4th at 298, the district court construed "de facto control" too narrowly. Under a correct analysis of "de facto exercise of control," sufficient evidence shows that BDCM exercised such control over all aspects of Bayou Steel's financing, operations, and personnel, that it incurred WARN Act liability as an employer. *See* 20 C.F.R. § 639.3(a)(2).

In *Fleming I*, we confirmed that "the record shows that BDCM was intimately involved in any number of significant decisions at Bayou Steel," *Fleming I*, 83 F.4th at 297, and that the record contained "voluminous evidence that BDCM micromanaged business decisions at the LaPlace mill."

*Id.* at 298. Nevertheless, acknowledging that "application of the factors is a factual question rather than a legal one," *id.* at 295, we were unable to say there was no genuine issue of material fact with respect to the exercise of "de facto" control under the five-factor test from the U.S. Department of Labor (the "DOL test" or "DOL factors"). *Id.* at 298. We therefore held that the district court had erred in granting summary judgment to BDCM. We said, "[t]he complex and lengthy record in this case includes a wealth of evidence relevant to this inquiry. The district court, as finder of fact, is best positioned to consider it in the first instance," *id.* at 299, and we remanded to the district court.

The district court held a bench trial "to decide one issue on remand," which was "whether [BDCM] exercised de facto control over Bayou Steel's decision to close its LaPlace steel mill and order Plaintiffs' layoffs." *Fleming II*, 2024 WL 1621128 at *1 (citing *Fleming I*, 83 F.4th at 300). However, after the trial, the district court issued findings of fact and conclusions of law that answered a narrower question: "the ultimate, and only, issue before the Court is 'who specifically directed the closing of the [Bayou Steel] LaPlace mill without proper notice.'" *Id.*

This reduced the de facto control inquiry to whether Plaintiffs had been able to prove the identity of a specific person who had ordered the layoffs. Answering that question, the district court found that, "[t]here was no testimony from any of the witnesses as to who decided that the plant would be closed without the WARN notices." *Id.* at *3. In turn, the district court's legal focus conceptualized only a lender/borrower relationship and a lender's decision not to advance additional funding—even though BDCM's relationship with Bayou Steel was that of both an affiliated entity and a lender, whose lender/borrower relationship was neither typical nor arm's length.

The district court went on to find:

> Based on the evidence submitted at trial, the Court finds that Black Diamond is not liable for closing the plant or terminating its employees without proper WARN Act notices *merely for its decision refusing to make additional loans to Bayou Steel*. The only reasonable inferences the Court draws from the evidence is that closing of the plant was inevitable without further loans, which neither Black Diamond nor the Senior Lenders were willing or required to provide.

*Id*. at *4 (emphasis added).

While the district court recognized that "Plaintiffs submitted evidence that Black Diamond was very involved in oversight of the operations at Bayou Steel," and that "[s]uch involvement in the business leading up to its closure is certainly some circumstantial evidence that Black Diamond may have ultimately ordered closure of the plant and termination of 300 employees," it put to the side the operational realities of the relationship between BDCM and Bayou Steel and held that "[o]nce [the closing] became inevitable, the independent directors of Bayou Steel *apparently* made the ultimate decision to close the plant and immediately begin terminations, which caused the WARN Act violation to occur." *Fleming II*, 2024 WL 1621128 at *3-4 (emphasis added).

With respect, this resolution conflated the affiliate and lender roles of BDCM and left unresolved the core question of which party exercised control over the decision to order the layoffs. Contrary to the majority's position, and explained in more detail below, I find this case presents not simply a factual challenge to the weight of the evidence as evaluated by the district court, but instead raises legal questions regarding how the evidence fits into the legal framework of WARN Act liability.

No. 24-30291

II.

Because the facts here require a context-intensive analysis, I first set forth the legal precedents relevant to conducting such analysis. Moreover, both *Fleming I* and *Fleming II* rest on precedents regarding WARN Act liability that require further explication to understand the de facto control prong of the DOL test.

A.

The foundational precedent of WARN Act liability originated outside our circuit. In *Pearson v. Component Technology Corp.*, 247 F.3d 471 (3rd Cir. 2001), the Third Circuit held that the DOL test[2] is the appropriate test for WARN Act liability for an affiliate company, as opposed to splintered approaches using various tests such as veil-piercing and integrated enterprise. *Pearson*, 247 F.3d at 484. There, the court emphasized that because "[a]ffiliated corporate liability under the WARN Act is ultimately an inquiry into whether the two nominally separate entities operated at arm's length," the DOL factors are a "nonexhaustive list . . . intended to allow the factfinder to consider other evidence, if any, of a functional integration between the two nominally separate entities—with, as always, an eye to the

---

[2] The DOL test is set forth in the regulations accompanying the WARN Act. The text of the pertinent regulation reads:

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2).

sorts of circumstances that courts have considered relevant to 'veil-piercing' inquiries in the past." *Id*. at 495. Accordingly, the test takes into account evidence of certain "hallmarks of integration" relevant to veil piercing analysis that are not ordinarily "of great importance in the labor context," but "that bear on the question whether the two companies failed to maintain an arm′s-length relationship." *Id*. at 496.

Relevant here, *Pearson* also considered "the de facto exercise of control" factor to be,

> an endorsement of the sort of hybrid direct liability analysis heretofore employed in the context of the integrated enterprise test—allowing consideration not only of whether the two corporations shared the same labor policies, . . . but also of whether the parent company directly exercised control over the particular policy at issue.

*Id*. at 490.

*Pearson* contains a discussion of what this "direct liability" analysis entails. 247 F.3d at 487 ("[P]arents may be 'directly' liable for their subsidiaries' actions when the 'alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management,' and the parent has interfered with the subsidiary′s operations in a way that surpasses the control exercised by a parent as an incident of ownership." (citing *United States v. Bestfoods*, 524 U.S. 51, 62 (1998))). Drilling down, "[t]hat 'control' includes the election of directors, the making of by-laws ... and the doing of all other acts incident to the legal status of stockholders." *Bestfoods*, 524 U.S. at 62 (quoting William O. Douglas & Carrol M. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193, 196 (1929) (Douglas)). Examples of the prohibited use of the latent power incident to stock ownership to accomplish a specific result include "interference in the

internal management of the subsidiary[or] an overriding of the discretion of the managers of the subsidiary." Douglas, at 209.

*Pearson* more precisely interpreted the de facto control factor as "allow[ing] the factfinder to consider whether the parent has *specifically directed* the allegedly illegal employment practice that forms the basis for the litigation." 247 F.3d at 491 (emphasis added). Importantly, *Pearson* held that the factors for consideration were not exhaustive. "[T]he Department of Labor's instructions are intended to allow the consideration of evidence that might otherwise fall outside of the listed factors in order to conduct [an inquiry into whether the two companies operated at arm's length]." *Id.*

Further, the Third Circuit in *Pearson* also applied the DOL factors beyond the scope of affiliated corporate liability, to lenders, further affirming its approach that function is paramount over form. *Id.* at 493, 495 ("[A]lthough courts should attend to the customary relationship between lender and borrower (just as they have attended to customary relationships between parents and subsidiaries in determining liability), *they should also make a functional assessment of the amount of control involved*.") (emphasis added).

Other circuits that have examined affiliate and independent contractor liability under the WARN Act have also adopted or favorably cited *Pearson*. *See, e.g.*, *Pennington v. Fluor Corp.*, 19 F.4th 589 (4th Cir. 2021) (agreeing with Third Circuit that DOL factors are the best method for determining WARN Act liability); *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221 (2d Cir. 2013) (adopting DOL factors).

However, although our court, like *Pearson*, has applied the same DOL test for both lender liability and affiliate liability, some of our sister circuits have distinguished between lender liability and affiliate liability in the WARN Act context. Particularly persuasive are the careful, full context-driven

analyses of lender liability employed by the Second and Ninth Circuits. *See Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148–49 (2d Cir. 2007) (holding that an essential part of the inquiry is whether the creditor has joined in or assumed control of the borrower's business as a going concern rather than as a means to protect its security for repayment); *see also Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572, Int'l Bhd. of Teamsters, AFL–CIO v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995) (same, noting DOL commentary on the applicability of the WARN Act and distinguishing between a fiduciary (or bankruptcy trustee) in a liquidation context as opposed to a fiduciary who may continue to operate the business for the benefit of the creditors).

B.

Our court favorably cited *Pearson*'s adoption of the DOL factors in *Administaff Companies, Inc. v. N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 458 (5th Cir. 2003) (rejecting the "joint employer" test in favor of the DOL factors as "the best method for determining WARN Act liability"). In *Administaff*, we upheld the district court's judgment that there was no WARN Act liability for an independent contractor on two separate grounds.

First, we held that "based on the plain language of the statute, Administaff is not liable for failure to give WARN Act notice because it did not order the closing of [the] facility."[3] *Id.* at 456. Second, we affirmed the district court's determination that the five-factor DOL test did not make

---

[3] The WARN Act provides, in part: "Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title [the 60-day notice provision] shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for [back pay and benefits]." 29 U.S.C. § 2104(a)(1).

Administaff an employer for WARN Act purposes, and that the DOL test, rather than the "joint employer" test, was the correct test to use. *Id.* at 457.

Holding that it was "undisputed that Administaff had no role in, or even advance knowledge of" the decision to close the plant, *id.* at 458, we did not engage in analysis of the de facto control prong of the DOL test, or discuss how it should be applied. We instead cited *Pearson* approvingly and without qualification, noting *Pearson*'s explanation that, "*de facto* exercise of control, 'allows the factfinder to consider whether the [business in question] has specifically directed the allegedly illegal employment practice that forms the basis for the litigation.'" *Id.* at 457–58.

Importantly, in *Fleming I*, we reiterated our adoption of the DOL test, again citing *Pearson* favorably, without qualification or limitation. *Fleming I*, 83 F.4th at 295 n. 14.

\* \* \*

Stated otherwise, assessing "de facto control" by way of a singular factual pursuit for a specific directive from one party is misguided. This approach does not account for the "functional assessment of the amount of control involved," by a lender, or especially by an affiliate, as set forth in *Pearson*. 247 F.3d at 495. Moreover, it would be problematic if "de facto control" was solely evidenced by a "specific direction" as opposed to allowing fact-finders to consider the actual evidence and indicia of integration.

Relatedly, in the labor context, "specific direction" by a parent or affiliate has a particular legal meaning. It is not limited to identifying the person who admits to giving an order and instead focuses on a parent's use of control to compel a subsidiary to make a decision. Thus, *Pearson* recognized that de facto control is "particularly striking" where the parent

effectuates control by "disregarding the separate legal personality of its subsidiary." *Pearson*, 247 F.3d at 504 (quoting *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 757 (7th Cir. 1989)); *see also Esmark*, 887 F.2d at 757 (examining parent liability for a subsidiary's unfair labor practice relating to a plant closure on the basis of control, holding that "[w]here the parent *specifically directs* the actions of its subsidiary, using its ownership interest to command rather than merely cajole, the possibility of its violating the federal labor laws is present." (internal citations and quotations omitted) (emphasis added)).

Where it is not clear who specifically ordered the layoffs, the search for "specific direction" in the WARN Act context of corporate affiliation and control requires analysis of the "functional integration" between entities, as described by *Pearson*. This is all the more essential when, as here, voluminous evidence of control exists. *Fleming I*, 83 F.4th at 298.

## III.

With this recalibrated understanding of liability under the WARN Act and the DOL test, it is important to characterize the relationship between the instant parties.

Here, and as discussed more thoroughly below, BDCM was in an affiliate relationship with Bayou Steel, and created a lender/borrower relationship when it loaned money after depleting Bayou Steel's cash flow by taking an equity distribution.

When, as here, a defendant in a WARN Act suit acted both as an affiliate and as a lender, I submit that courts must examine both roles. Although a lender will not be liable under the WARN Act "solely because of the financial dependence that necessitated the loan in the first place," *Pearson* 247 F.3d at 496, when lenders undertake operational control of a borrower's business, they may well incur WARN Act liability.

No. 24-30291

## A.

Bayou Steel was acquired by BDCM, through affiliated entity BDCM Opportunity Fund IV, L.P. ("BDCM Opp Fund IV"), in April 2016. Just over three years later, on September 30, 2019, Bayou Steel laid off over 300 employees, and the next day filed a chapter 11 bankruptcy petition, resulting in a liquidation sale of its assets. The events during that intervening three-year period are the focus of this case.

Bayou Steel was acquired for $90 million, using $60 million in equity from BDCM Opp Fund IV, plus $30 million from a Bank of America/Suntrust revolving debt facility. Shortly after the acquisition, the Bayou Steel board of directors (the "Bayou Steel Board") was appointed.

Initially, there were six Bayou Steel Board members: the first CEO of Bayou Steel, Rob Simon,[4] two BDCM employees, Phil Raygorodetsky and Sam Farahnak (the "BDCM Board Members"); and three individuals chosen by BDCM, Rob Archambault, Bob Unfried, and Terry Taft (accepting the term used by the parties, the "Independent Board Members").[5]

---

[4] Simon was fired in November 2017. His seat on the Bayou Steel Board was not filled until early 2019, when a third BDCM employee, James Hogarth, was appointed to the Board.

[5] Because it is important to understand the roles of the individuals involved in the events that followed, they are listed in the chart below:

| NAME | ROLE |
|------|------|
| Phil Raygorodetsky | BDCM employee, Bayou Steel Chairman of the Board |
| Sam Farahnak | BDCM employee, Bayou Steel Board Member |
| James Hogarth | BDCM employee, Bayou Steel Board Member (2019) |
| Rob Archambault | BDCM selected Independent Bayou Steel Board Member |
| Bob Unfried | BDCM selected Independent Bayou Steel Board Member |

No. 24-30291

On March 17, 2017, less than a year after the acquisition, Bayou Steel made a $30 million equity distribution to BDCM Opp Fund IV. BDCM employee Farahnak, who was also a Bayou Steel Board member, emailed BDCM principal Stephen Deckoff that, "[w]e distributed $30 m from Bayou to the Opp IV JPM account today. Roughly half of the initial equity investment." The parties point to nothing in the record to indicate that the Bayou Steel Board voted to approve this equity distribution to BDCM Opp Fund IV. Moreover, the trustee for the Bayou Steel bankruptcy estate later filed a lawsuit against BDCM, BDCM Opp Fund IV, BDCM affiliate Black Diamond Commercial Finance, LLC ("BDCF"), and the Bayou Steel Board members, alleging breach of fiduciary duty and other claims over this distribution. That suit resulted in settlements of $17 million with the insurers for the defendants.[6]

| Terry Taft | BDCM selected Independent Bayou Steel Board Member |
|---|---|
| Rob Simon | BDCM selected CEO of Bayou Steel (April 2016 to November 2017) |
| Mike Williams | BDCM selected CEO of Bayou Steel (May to September, 2019) |
| Alton Davis | BDCM selected President and COO of Bayou Steel (Acting CEO between Simon and Williams) |
| Kristen Barney | HR Director Bayou Steel |
| Kevin Kirkland | VP of Finance for Bayou Steel |
| Ritesh Tanna and Gregory Schunk | BDCM employees |
| Polsinelli Law Firm | BDCM selected Bankruptcy counsel |
| Candlewood Partners | BDCM selected Financial Advisor |

[6] Litigation was filed by the chapter 7 trustee against BDCM, BDCM Opp Fund IV, BDCF (collectively the "Entity Defendants"), Raygorodetsky, Farahnak, Archambault, Unfried, and Taft. The trustee sought to avoid or claw back the $30 million dividend to BDCM Opp Fund IV; asserted claims of breach of fiduciary duty against the Bayou Steel Board member defendants; and asserted claims of aiding and abetting breach of fiduciary duty against the Entity Defendants. On December 3, 2024, the bankruptcy court entered an order approving settlement of the trustee's claims against the Independent Board Members for $2.75 million, paid by the Bayou Steel Directors and

No. 24-30291

Then, on December 21, 2017, on behalf of Bayou Steel, Farahnak executed a Subordinated Loan and Security Agreement (the "BDCF Loan Agreement") with BDCF. Over the next 18 months, BDCF loaned Bayou Steel approximately $33 million under the BDCF Loan Agreement, approximately the same amount of the March 2017 equity distribution.[7] In other words, the equity holder became a subordinated secured lender by

Officers Insurance Policy (the "D&O Policy"). On April 25, 2025, the bankruptcy court entered a second order approving settlement of the trustee's claims against the Entity Defendants, Raygorodetsky, and Farahnak, which were settled for $14.25 million, paid by the D&O Policy and other unidentified insurance policies available to the Entity Defendants. To be sure, settlement of claims is not proof of the underlying allegations, and the two settlement agreements (as settlement agreements often do) both specify that there is no admission of liability. "A court may take judicial notice of the record in prior, related proceedings, and draw reasonable inferences therefrom." *Chevron Oronite Co., L.L.C. v. Jacobs Field Servs. N. Am., Inc.*, 951 F.3d 219, 229 (5th Cir. 2020); *Brown v. Tarrant Cnty., Texas*, 985 F.3d 489, 493 n. 4 (5th Cir. 2021) (citing *United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001)).

[7] BDCM, BDCM Opp Fund IV, and BDCF are all separate entities as helpfully set forth in *Fleming I*, 83 F.4th at 284. Because WARN Act liability can extend to affiliates, the highly interconnected nature of these entities is relevant to the de facto control analysis. The testimony of BDCM principal Stephen Deckoff provided a general overview of the BDCM corporate structure:

> Black Diamond has multiple businesses. We have a debt side of Black Diamond, which is our historical business, as well as an equity side. In the debt side, we invest in both loans as well as bonds. And then on the equity side, we have private equity investments, as well, on occasion, we invest in public companies.

Deckoff testified that he was the ultimate decision maker for the Black Diamond entities, that he was kept abreast of the Bayou Steel acquisition process, that he approved the selection of the Bayou Steel Board members, that he had approved all of the lending from BDCF to Bayou Steel, and that he had personal fiduciary duty to investors in BDCM Opp Fund IV.

No. 24-30291

causing Bayou Steel to make an equity distribution and then loaning a similar amount and taking a security interest in Bayou Steel property.[8]

B.

The financial relationship between the parties provides baseline context for BDCM's involvement in Bayou Steel. Namely, the lending transaction with BDCF was not an "arm's length" transaction, *Pearson*, 247 F.3d at 495, and a comparison of the lending relationship between Bayou Steel and its two lenders, Bank of America and BDCF, is illuminating for purposes of the de facto control analysis. A comparison of the two loans makes clear that the baseline relationship between BDCM and Bayou Steel from the outset was not that of an arm's length lender, but that of close affiliates.

1.

I begin with Bayou Steel's loan arrangement with Bank of America as a benchmark of an arm's length commercial transaction. The revolving loan facility had a maximum amount of $75 million (the "BOA Loan"). The BOA Loan required regular reporting to Bank of America from Bayou Steel in the form of borrowing base certificates. The record indicates there were standard audit requests from Bank of America to Bayou Steel which were conducted by a third party. When Bayou Steel defaulted on the BOA Loan in August of 2019, by falling under the $10 million minimum availability requirement,

---

[8] The end result of these transactions was that when Bayou Steel eventually filed for bankruptcy, BDCF and BDCM Opp Fund IV were able to file proofs of claim against the Bayou Steel bankruptcy estate as secured creditors. This put them in line to be paid ahead of the unsecured creditors, who were primarily trade vendors who had done business with Bayou Steel. Had BDCM Opp Fund IV not taken the $30 million equity distribution, that portion of the equity interest would have been last to receive a distribution from the bankruptcy estate.

Bank of America sent a default letter, and required Bayou Steel to engage a third-party financial advisor, post-default, to monitor Bayou Steel's financial condition and provide recommendations. Bank of America also required additional reporting from Bayou Steel as a result of the default.

As Bayou Steel's financial situation deteriorated, Bank of America sent additional default letters. Finally, determining that it could no longer lend additional funds to Bayou Steel, Bank of America sent a Notice of Acceleration calling the BOA Loan and demanding immediate repayment under the terms of the BOA Loan Agreement. These are all typical lender actions where a commercial borrower has defaulted, and there is no question that the actions by Bank of America were clearly designed to "protect its security for repayment." *Coppola*, 499 F.3d at 149.

2.

Contrast this with the BDCF Loan, which was entered into without the approval of the Bayou Steel Board.  On December 21, 2017, Bayou Steel entered into the BDCF Loan Agreement. Independent Board Members Archambault and Unfried both testified that they did not vote to approve this loan from BDCF to Bayou Steel. It was Farahnak—in his capacity as vice-president of Bayou Steel—not Bayou Steel's CEO or CFO, or any of the other Bayou Steel officers, who executed the BDCF Loan Agreement on behalf of Bayou Steel. [9]

---

[9] As set forth in *Fleming I*, when BDCM Opp Fund IV acquired BD LaPlace, LLC (Bayou Steel) and its parent company BD Bayou Steel Investment, LLC, BDCM Opp Fund IV created two new companies—Bayou Steel BD Holdings, LLC (BD Holdings) and Bayou Steel BD Holdings II, LLC (BD Holdings II)—to hold the membership units of the newly acquired companies. *Fleming I*, 83 F.4th at 285. Both BD Holdings and BD Holdings II are single-member LLCs without any employees. *Id.* According to his testimony, at the time of the acquisition, Farahnak was named as vice-president of Bayou Steel; this position gave him the authority to execute documents on behalf of Bayou Steel.

No. 24-30291

Interestingly, Farahnak's trial testimony disavowed the extent of his involvement in taking actions on behalf of Bayou Steel but was contradicted by record evidence. In response to questions from Appellants' counsel about his role as vice president of Bayou Steel, Farahnak testified:

> I just wanted to add one thing on the VP or secretary title that I had. It was really put in place prior to closing on the [BDCM] acquisition [of Bayou Steel]. The acquisition of the assets was really just that. There wasn't a company there. So someone had to sign Alton Davis' employment agreement, someone had to sign the insurance documents, someone had to sign the Bank of America documents. This is all stuff that happened prior to closing [in April 2016]. Post closing, I had no responsibility for that role. . . [I] hadn't had any day-to-day operating responsibilities at any point in time *and hadn't used that position for any function related to the company the second Black Diamond's funds took ownership of the Bayou Steel Group companies* (emphasis added).

This testimony conflicts with the fact that on December 21, 2017, Farahnak executed the BDCF Loan Agreement as vice president of Bayou Steel without Bayou Steel Board approval.

The BDCF Loan Agreement at section 7.2.2 references a Subordination and Intercreditor Agreement with Bank of America that permitted BDCF to secure its loans with mortgages on Bayou Steel's real estate.[10] The parties point to nothing in the record showing that any Bayou Steel officer was involved in negotiating permission for the BDCF Loan with Bank of America, and it bears repeating that the record shows this transaction was made without Bayou Steel Board approval. Indeed, the Independent

---

[10] Because of covenants in the BOA Loan Agreement, Bank of Ameria had to consent to the subordinated secured financing extended by BDCF.

Board Members testified they did not know Bayou Steel had granted a security interest to BDCF until after the fact.

The record further shows that Raygorodetsky and Farahnak were the only people involved in the negotiations with Bank of America to permit the BDCF Loan. In his trial testimony, Farahnak disclaimed his importance in the negotiations with Bank of America. Here too, his denial of involvement in making decisions that affected Bayou Steel is contradicted by the emails and other documents in the record. Farahnak also executed mortgages of Bayou Steel property on behalf of Bayou Steel and in favor of BDCF (again signing as vice-president of Bayou Steel).

Further, notices *to* Bayou Steel under the BDCF Loan Agreement were not directed to Bayou Steel or any of its officers but instead were to be addressed to Farahnak and Sam Goldfarb (BDCM general counsel) at BDCM.

The district court's determination that BDCM "is not liable [under the WARN Act] merely for its decision refusing to make additional loans to Bayou Steel," therefore anchors on a lending relationship inconsistent with the realities of the relationship between these parties. To be clear, I agree that BDCF was *not* required to lend additional funds to Bayou Steel. But, the facts surrounding the making of the BDCF Loan show that there was no true corporate oversight by the Bayou Steel Board or management, and thus, no limitation on what BDCM could do with Bayou Steel. The importance of the fact that BDCM used its employee Farahnak to cause Bayou Steel to enter into the BDCF Loan Agreement, without proper corporate authorization by Bayou Steel, cannot be overstated.

BDCM asserts as a defense that the BDCM Board Members were wearing their Bayou Steel "hats" when making decisions, citing to *United*

*States v. Bestfoods*, 524 U.S. 51 (1998). But *Bestfoods* holds only that there is a presumption:

> [I]t is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.

524 U.S. at 70 n.13.

The record does not support the conclusion that the actions of the BDCM Board Members in arranging and entering into the BDCF Loan on behalf of Bayou Steel were consistent with the "norms of corporate behavior," such that they are entitled to the presumption that the BDCM Board Members were acting in the best interests of Bayou Steel.

Because courts must examine both the lender and affiliate roles where both exist, the circumstances of the BDCF Loan are highly relevant to the "inquiry into whether [BDCM and Bayou Steel] operated at arm's length." *Pearson*, 247 F.3d at 495.

## IV.

### A.

On an appeal from a bench trial, we review factual findings for clear error and legal issues de novo. *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015). The majority characterizes this appeal as exclusively involving a factual challenge that is reviewed for clear error, but I disagree that there are only factual challenges presented here. This appeal presents "so-called 'mixed question[s]' of law and fact," which ask "whether the historical facts ... satisfy the statutory standard, or to put it

another way, whether the rule of law as applied to the established facts is or is not violated." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 394 (2018). As explained in *CWCapital*, some mixed questions are not simply a matter of making credibility judgments or weighing evidence, but instead "require courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard." *Id.* at 396. In these cases, "appellate courts should typically review a decision de novo." *Id.*

Further, although we do not reverse factual findings after a bench trial "simply because we are convinced that we would or could decide the case differently," *Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 374 (5th Cir. 2024) (citing *Guzman*, 808 F.3d at 1036), "the clearly erroneous standard of review does not apply to those factual findings made under an erroneous view of controlling legal principles." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 515 (5th Cir. 2016). Of course, when the clearly erroneous standard of review does apply, our test is whether we are left with "a definite and firm conviction that the district court committed a mistake." *Guzman*, 808 F.3d at 1036.

### B.

In *Fleming I*, we reiterated that the DOL regulations, found in 20 C.F.R. § 639.3(a)(2), specified the appropriate "'factors to be considered' in determining whether a related entity is so intertwined with the employer that the two may be considered a single employer, such that the related entity may be liable for the actual employer's WARN Act violation." 83 F.4th at 295.

We affirmed the district court's findings that there was no issue of material fact with respect to any prong of the DOL test other than de facto control. But we also noted that "Plaintiffs' argument about BDCM's practical control over Bayou Steel are relevant to the de facto control factor,"

*id.* at 296 n. 16, and that, Plaintiffs' arguments about "the independence of the management of Bayou Steel is relevant to whether BDCM exercised de facto control over Bayou Steel." *Id.* at 297 n.18.

In discussing why there was a material fact dispute for the district court to resolve with respect to the de facto control prong of the test, we recognized that Bayou Steel's own officers and directors denied knowing who decided to close the LaPlace mill; that the record showed BDCM was intimately involved in any number of significant decisions at Bayou Steel; that the circumstances surrounding the bankruptcy might be probative, but not determinative; and that while Bayou Steel's HR manager had worked with counsel to coordinate WARN Act notices, that activity did not indicate who had made the decision to close the plant. *Id.* at 297-98. We tasked the district court, as the fact finder, with "squaring the evidentiary circle" with respect to this conflicting information about the relationship between BDCM and Bayou Steel. *Id.* at 298.

Accordingly, and within the context that BDCM must be assessed as both an affiliate of and a lender to Bayou Steel, I examine the full picture of evidence of de facto control and then zoom in on the "specific direction" evidence available related to the layoff notice that demonstrates the enmeshment between the parties.

## C.

At trial, no testifying witness, neither Davis (President and COO of Bayou Steel), nor Farahnak (BDCM employee), nor Stephen Deckoff (the founder of BDCM), admitted to ordering the abrupt termination of 300 Bayou Steel employees in LaPlace, Louisiana.

Given those denials, with no one acknowledging who ordered the layoffs, caselaw correctly applying the DOL factors requires close examination of the record to perform the "functional assessment of the

No. 24-30291

amount of control involved" between the companies. *Pearson*, 247 F.3d at 495.

1.

Although there is limited caselaw applying the de facto control prong of the DOL factors, courts that have analyzed de facto control set forth some factors which weigh in favor of finding de facto control, finding involvement in choosing or hiring management or excessive involvement in personnel matters is significant. *Guippone v. BHS & B Holdings LLC*, 737 F.3d 221, 227 (2d Cir. 2013) (parent company choosing subsidiary's management evidence of de facto control); *Pearson*, 247 F.3d at 500 (lender's control over hiring and firing of borrower's president should be considered under de facto control prong rather than unity of personnel policies prong of DOL test); *Vogt v. Greenmarine Holding, LLC*, 318 F.Supp.2d 136, 144 (S.D.N.Y. 2004) (parent company hiring subsidiary's CEO considered as part of de facto control analysis). When examining the record in its entirety, there is ample evidence of BDCM's extensive control over Bayou Steel's management and personnel, and thus de facto control in the affiliate context for purposes of incurring WARN Act liability.

The record is replete with examples of BDCM's involvement in Bayou Steel's personnel matters. BDCM employees Raygorodetsky and Farahnak both involved themselves substantially in these matters, often to the exclusion of the Independent Board Members and Bayou Steel management. Examples of this include the monitoring and firing of the first CEO, Rob Simon;[11] making decisions about benefits for the salaried employees of Bayou Steel; directing Bayou Steel management to discuss

---

[11] For example, when Simon requested further information about the reasons for his termination, it was BDCM, not Bayou Steel, that responded.

suspension of production bonuses with the union, including pushing management to move faster on negotiating the changes BDCM wanted; deciding to terminate the daily employee safety meetings at Bayou Steel to save on overtime costs despite management opposition; renegotiating the employment contract of Bayou Steel's vice president of sales; making decisions about releasing the Bayou Steel CFO from a non-compete agreement; choosing and hiring CEO Williams; executing employment agreements for Bayou Steel officers; and approving an increase in compensation for HR Director Barney.

The record shows that Raygorodetsky and Farahnak exercised decisive control over the selection and supervision of Bayou Steel's management. It also shows that they insisted on implementing decisions regarding rank-and-file employee benefits, bonuses, and safety meetings, even when Bayou Steel management would have preferred to make different decisions. On their own, perhaps none of these actions is determinative, but taken together, these actions are evidence that BDCM exercised significant control of personnel matters.

## 2.

As further evidence of BDCM control, Bayou Steel management reported directly to a number of BDCM employees. Kirkland, vice president of finance, testified that the operations side of Bayou Steel was reporting to Raygorodetsky, Farahnak, Hogarth (a BDCM employee who was added to the Bayou Steel Board in early 2019), and Greg Schunk, a lower level BDCM employee. He testified that during his entire tenure as vice president of finance of Bayou Steel, it was a regular practice for the BDCM employees to be very involved in operations, including even tracking such mundane matters as Bayou Steel's inventory of spare parts for equipment. The record

shows that BDCM's involvement extended into operations of Bayou Steel as well.

Indeed, at trial, Davis, President and COO, who was with Bayou Steel from the time BDCM acquired it until the assets were sold in the bankruptcy case, and who also acted as the interim CEO from late 2017 to mid-2019, testified that during his tenure at Bayou Steel, there was not any significant decision concerning the finances or operations of Bayou Steel that did not require the involvement of BDCM employees Raygorodetsky and Farahnak. There was additional evidence in the record that both CEOs of Bayou Steel, Rob Simon and Mike Williams, felt they had been "micromanaged" by the BDCM employees, particularly Raygorodetsky. *See also Fleming I*, 83 F.4th at 297-98 (noting that the record contains "voluminous evidence that BDCM micromanaged business decision").

3.

In addition to the irregularities with the BDCF Loan in the lender liability context discussed above, there are other indicia of financial control in the affiliate context that are relevant here.

i.

Equally important to the de facto control analysis, as noted in *Pearson*, is the unusual control BDCM and the BDCM Board Members exerted over Bayou Steel's finances in general. *See Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 227 (2d Cir. 2013) (holding that, in the context of affiliate liability, negotiating affiliate's financing is evidence of de facto control); *see also Loc. 397, Int'l Union of Elec., Elec. Salaried Mach. & Furniture Workers, AFL-CIO v. Midwest Fasteners, Inc.*, 779 F. Supp. 788, 799 (D.N.J. 1992) (finding de facto control under DOL test where communication by lender concerning subsidiary company's finances were directed to principal of

parent, and that same person conducted all negotiations with lender and other potential lenders, and controlled the credit for the subsidiary).

Kevin Kirkland, the vice president of finance for Bayou Steel testified that BDCM was highly involved in cash management activities to the extent that that he characterized it as "extreme micromanaging." He testified that BDCM was involved in the cash management of Bayou Steel on a day-to-day basis and had a "lot of input" into payment of vendors. He testified that when he started with Bayou Steel in August of 2018, he provided monthly financial reporting to BDCM, but that increased over time to weekly and even daily reporting.

Kirkland also testified that he was sending financial reporting to Raygorodetsky, Farahnak, Hogarth, and Schunk, but not the Independent Board Members. Kirkland testified that financial forecasting would regularly have to be approved by the BDCM Board Members, but not the Independent Board Members.[12]

Finally, Kirkland testified that even though he was the vice president of finance for Bayou Steel who handled routine matters such as preparing reports for Bank of America, it was Farahnak who handled all negotiating and communications regarding the Bayou Steel default on the BOA Loan on behalf of Bayou Steel; indeed, Kirkland was not even copied on many of these communications.

---

[12] The Independent Board Members—Archambault, Unfried, and Taft—had much different access to information than the BDCM Board Members. From the record, it is apparent that the Independent Board Members were routinely not copied on emails regarding both operations and financing between Bayou Steel management and the BDCM Board Members and other BDCM employees, particularly in 2019, leading up to the plant closure and layoffs.

In fact, on September 27, leading up to Bank of America's termination of the Bayou Steel lending relationship, BDCM employee Hogarth sent an email to Bayou Steel's newly hired financial advisor, Candlewood, copying BDCM employees Tanna and Schunk that Bank of America had asked for a call on the thirteen-week budget for Bayou Steel. When scheduling the call, a Candlewood associate asked "Should the Company's team be included on this invite? I'm guessing yes." A Candlewood partner responded, "No company on call." Here again, that BDCM and Candlewood actively excluded Bayou Steel management from discussions with Bank of America is strong evidence that BDCM was exercising de facto control over Bayou Steel's financing.

These additional facts, combined with the aforementioned BDCF Loan Agreement, entered into without any Bayou Steel officer or management involvement and without Bayou Steel Board approval, are strong evidence showing that BDCM exercised de facto control of Bayou Steel's financing.

ii.

As noted, the district court characterized the circumstance here as primarily a lender/borrower relationship. The district court drew a comparison with *Pearson*, noting that the lender there was involved in the hiring of the company's CEO, approving all employee salaries in excess of $100,000 per year, receiving regular updates on the company's financial position, and drafting the proposal for the liquidation of the company. *Fleming II*, 2024 WL 1621128 at *3. The district court went on to find:

> Like in *Pearson*, the managers of Bayou Steel were well aware of its financial plight. Its board approved the hiring of Polsinelli and Candlewood to guide it through bankruptcy; its CEO cleared out his office three days before the plant's closure; its President and Chief Operating Officer Alton Davis knew that

the Company could not survive without additional loans or funding from Black Diamond.

*Id.*

That finding, however, overlooks that the management's awareness of Bayou Steel's precarious financial situation is not equivalent to the ability to take action. To the contrary, Bayou Steel's management was not empowered to act independently of BDCM, because BDCM controlled Bayou Steel to such an extent that BDCM was "using its ownership interest to command rather than merely cajole." *Esmark*, 887 F.2d at 757. As we noted in *Fleming I*, "the independence of the management of Bayou Steel is relevant to whether BDCM exercised de facto control over Bayou Steel." 83 F.4th at 297 n.18.

Further, because the facts here stand in notable contrast to those in *Pearson*, the district court's comparison does not hold up. In *Pearson*, the lender took a security interest in the borrower's stock, and when the borrower defaulted, the lender, using the control it gained through the stock it now controlled, voted to install a new board of directors, who chose new management. *Pearson*, 247 F.3d at 478-79. The Third Circuit found that this was not enough to establish de facto control because there was evidence in the record that the borrower conducted independent research into its legal obligations, negotiated with the lender, made attempts to secure additional financing, and warned the lender that it would be forced to shut down without additional lending. *Id.* at 504-05. Here, there is no evidence of this type of independent activity by the Bayou Steel Board or management.

4.

BDCM also exercised outsized control of the Bayou Steel Board, often by excluding the Independent Board Members or by failing to provide them with contemporaneous information about Bayou Steel.

34

Shortly after BDCM acquired Bayou Steel in April of 2016, the Bayou Steel Board was selected by BDCM and appointed. Initially, the Bayou Steel Board appears to have functioned in a standard fashion. The Independent Board Members attended regular board meetings, received regular reporting from Bayou Steel, participated in monthly phone calls, and engaged in oversight of Bayou Steel. But the Independent Board Members all testified that this involvement dropped off over time. In mid-to-late 2017, despite attempts to remain engaged, the Independent Board Members were discouraged from doing so, specifically by BDCM employee Raygorodetsky. The Independent Board Members testified that in the later part of 2018, and in all of 2019, there were no Bayou Steel Board meetings other than one telephone meeting called to approve hiring Mike Williams as CEO of Bayou Steel, who was hired in May of 2019.

In direct contrast to their push to reduce the engagement of the Independent Board Members, the BDCM Board Members became more involved, leading to the displacement of Bayou Steel management's ability to make decisions for the company absent BDCM approval. As we noted in *Fleming I*, there is "voluminous evidence that BDCM micromanaged business decisions at the LaPlace mill," 83 F.4th at 298, as described in greater detail above.

CEO Williams, appointed in 2019, testified he was involved in weekly telephonic meetings with BDCM employees Raygorodetsky, Farahnak, and Hogarth, but not the Independent Board Members. Williams also testified that he created a turnaround plan for Bayou Steel that was provided to BDCM, but the Independent Board Members were not included in the distribution.

Similarly, as discussed above, financial reporting information was sent to the BDCM employees but not the Independent Board Members. Leading

up to the plant closure and layoffs, the Independent Board Members were not told contemporaneously of the problems with the BOA Loan, the initial August 29, 2019 declaration of default by Bank of America, or the additional Bank of America default notices dated September 12, 2019, and September 19, 2019. They received information about these events only well after the fact.

Further, as noted above, the Independent Board Members did not learn of the BDCF Loan to Bayou Steel until after it had been made, even though it would be highly irregular for a company to enter into such financing without board approval. It cannot be that the BDCM employees were wearing their Bayou Steel Board Member "hats" if the Independent Board Members were excluded from both receiving the information and the decision-making process.

5.

Finally, the process of placing Bayou Steel into bankruptcy is demonstrative of BDCM's control. In *Fleming I*, we observed that the "focus is on the mill closing and the layoffs, not the bankruptcy," yet also noted that, "[t]he directors' due diligence in filing for bankruptcy may well be probative of who decided to close the plant, but it is not determinative." 83 F.4th at 298. Here again, this point requires careful analysis of the entire record.

The district court placed great, though I think mistaken, weight on the deposition testimony of Robert Archambault, one of the three independent directors. The district court found that "the independent directors of Bayou Steel *apparently* made the ultimate decision to close the plant and immediately begin the terminations which caused the WARN Act violation to occur." *Fleming II*, 2024 WL 1621128 at *4 (emphasis added). In reaching this conclusion, the district court's opinion cites to Archambault's testimony: "'From what I recall, it was a recommendation from

Candlewood, and the board approved the recommendation.'" *Id.* at *3 (quoting deposition transcript). But, as the district court recognized, "when pressed about the specifics of this decision, Archambault stated he could not recall the timing or location of the decision." *Id.* Further, the district court acknowledged there was testimony from Archambault later in the deposition clarifying that any vote would have taken place *after* the layoffs had already happened. *Id.* at *2.

Despite noting this lack of detailed recall, the timeline problem, and that Archambault's testimony regarding the vote was not corroborated by the other Independent Board Members, the district court found that this testimony was "only direct evidence before the Court about the decision to terminate the employees." *Id.* at *3.

The district court failed to explain how the vote of the Independent Board Members that did not take place until the afternoon of September 30 could have constituted the decision to make the layoffs which occurred the morning of September 30. Instead, the district court simply concluded the Independent Board Members "apparently" made the decision to close the plant and begin the employee terminations. *Id.* at *4. Here again, the context surrounding the bankruptcy requires careful analysis of the entire record.

i.

A corporate resolution by the Bayou Steel Board was required to put the company into bankruptcy, yet the Independent Directors were not told of the dire financial straits the company was in until BDCM had already made its decision to close down Bayou Steel. At that point, the Independent Board Members were asked to rubber stamp BDCM's decision.

The Independent Board Members testified that they were first told of the financial problems facing Bayou Steel at the board meeting on Sunday, September 22, where they were asked to vote to retain the BDCM

recommended professionals (Candlewood as a financial advisor and Polsinelli as counsel) to evaluate options for Bayou Steel going forward.[13] The Independent Board Members all testified that their understanding was the professionals would evaluate Bayou Steel's situation and return to the board to present options for the company. Independent Board Member Unfried testified that he did not know a bankruptcy filing would be the recommendation of the advisors until the September 27 board meeting. Taft testified similarly. The Independent Board Members did not actually vote to approve a bankruptcy filing until the afternoon of September 30.

Despite this, BDCM employees (particularly Hogarth) instructed Bayou Steel management to move forward with preparing the company to file bankruptcy, representing that the Bayou Steel Board had made this decision. CEO Williams testified that when Hogarth called him the evening of September 22, he was told the "board had elected to pursue bankruptcy filing." Williams testified that, after the September 22 board meeting, he was directed by Hogarth to meet with Candlewood and Polsinelli to "discuss and negotiate fees and rates for bankruptcy filing."[14]

---

[13] In September 2019, leading up to the September 22 board meeting at which the BDCM Board Members recommended engaging Polsinelli and Candlewood to provide recommendations to the full board, the following events (of which none of the independent board members was concurrently informed) took place: 1) Bank of America declared default on its loan to Bayou Steel; 2) in connection with the BOA Loan default, Bayou Steel was required by Bank of America to engage CR3 Partners, LLC, a business consultant, to analyze Bayou Steel's cash flow problems; 3) BDCM principal Stephen Deckoff made two visits to Louisiana to tour the Bayou Steel plant due to his concerns about Bayou Steel; and 4) BDCM employees Hogarth, Ritesh Tanna, and Schunk prepared for Deckoff a bankruptcy-related Debtor-in-Possession funding forecast for Bayou Steel.

[14] Again, it was BDCM, not Bayou Steel, who selected Candlewood and Polsinelli and then negotiated and prepared the engagement letters for CEO Williams to execute.

Taken together, these facts do not evidence a decision by Bayou Steel management or its Board to pursue bankruptcy, rather they show Bayou Steel was directed by BDCM to prepare for bankruptcy.[15]

As noted in *Fleming I*, while the bankruptcy filing is not determinative of the layoffs, the two are closely linked for purposes of the de facto control analysis—bankruptcy is not only a major decision and corporate event for any company, but here especially it connected to the employee layoffs. The record shows the bankruptcy preparations were undertaken at the direction of the BDCM employees, particularly Hogarth and Tanna. BDCM, through these employees, was directing the decision-making well before the Independent Board Members were given the bankruptcy recommendation on September 27 or voted to approve the bankruptcy filing on September 30. The Independent Board Members did not know a bankruptcy filing would be recommended until September 27, and the parties point to no evidence the Independent Board Members were aware of the preparations taking place before then.

ii.

Regarding the timing of these events, BDCM notes that there is differing testimony regarding both when the decision was made to place Bayou Steel into bankruptcy and to lay off the employees without 60-day notice. BDCM argues that Archambault, Farahnak, and Unfried all testified

---

[15] Just after midnight on October 1, Polsinelli filed three bankruptcy petitions and at least nine "first-day" motions for Bayou Steel and two related entities. These lengthy motions contained detailed information about the companies, and it is clear their preparation would have begun before the Independent Board Members voted to approve a bankruptcy filing the afternoon of September 30, and most likely even before they were given the bankruptcy recommendation on September 27.

that the Independent Members voted to place Bayou Steel into a bankruptcy on September 27.[16]

But other testimony contradicts BDCM's asserted timeline and shows the Independent Board Members did not make their decision until the afternoon of September 30. The events surrounding the September 27 board meeting also reveal the lack of knowledge of the Independent Board Members. At the meeting, the Independent Board Members (now understanding that the BDCM Board Members intended to put the responsibility for approving a bankruptcy filing on their shoulders after declaring they would abstain from voting) asked for two things: 1) confirmation that there was directors and officers (D&O) insurance coverage in place, and 2) independent counsel to advise them.

The critical timeline thereafter is this: on Monday morning, September 30, layoff notices were given to the workers at the Bayou Steel plant between 7:30 and 9:00 a.m. At 8:00 a.m., the Independent Board Members met with their counsel. At 12:22 p.m., Kristen Barney (Bayou Steel's HR director) sent confirmation of the D&O insurance coverage to Hogarth. At 12:36 p.m., Hogarth emailed Archambault to confirm the D&O coverage. At 1:03 p.m., Archambault sent an email to Hogarth with his signature on the resolution approving the bankruptcy filing. The record does not show when Taft and Unfried sent their signatures, but they testified it was after meeting with counsel and receiving confirmation of the D&O coverage, so Monday early afternoon, at the soonest, hours after the layoffs were effected. Thus, the layoff decision was put into motion well before the

---

[16] By this argument, BDCM tries to fix the timeline problem and show that the bankruptcy, and thus the layoffs, were approved on September 27, allowing BDCM to cast the Independent Board Members as the decision makers rather than BDCM.

Independent Board Members provided final sign-off on the bankruptcy filing—a filing they were largely kept on the outskirts of to begin with.

Moreover, there is no evidence in the record to show that a vote was taken on September 27, other than the conflicting, and somewhat confused, testimony raised by BDCM. The emails show the Independent Board Members were not comfortable making any decision until they had spoken with their own counsel.

BDCM's argument that a vote was taken at the September 27 board meeting also suffers from another difficulty. Multiple witnesses testified that there were never minutes taken of *any* Bayou Steel board meeting. As the district court noted, this is not typical; often board meetings are recorded, and if they are not, then at least minutes are kept of the meetings to provide a record. Deciding not to keep board meeting minutes is certainly not a model for good corporate governance or transparency. At any rate, it should be uncontroversial that where BDCM so thoroughly controlled the Bayou Steel Board, the lack of meeting minutes weighs against BDCM's claim that the decision was made at any time prior to the Independent Board Members signing the resolution, particularly where there is other evidence contradicting this assertion.

*      *      *

Cumulatively, the control exercised by the BDCM employees over the personnel matters, operations, and finances of Bayou Steel, coupled with the exclusion of the Independent Board Members, both from relevant information and from decision making, demonstrates that it was BDCM— and not Bayou Steel Board—making all significant financial, operational and personnel decisions for Bayou Steel. Decisions made by the BDCM employees do not constitute the actions of the full board or Bayou Steel where there was no meaningful ability by the Bayou Steel Board or its

management to act independently of BDCM. The district court did not engage in a thorough analysis, weighing these facts or making a credibility determination that certain witnesses were more believable than others, such that its decision is owed the deference suggested by the majority.[17] These facts, therefore, weigh in favor of finding that de facto control of Bayou Steel was exercised by BDCM.

## B.

Aside from the "voluminous" evidence of control discussed above, *Fleming I*, 83 F.4th at 298, the final "de facto control" evidentiary inquiry is into the circumstances directly around the layoffs. The district court's opinion focused primarily on what it interpreted as our remand instruction: "the ultimate, and only, issue before the Court is 'who specifically directed the closing of the LaPlace mill without proper notice.'" *Fleming II*, 2024 WL 1621128 at *1.

In *Fleming I*, we stated that the fact that Kristen Barney, the HR director for Bayou Steel, worked with Polsinelli as outside counsel to coordinate WARN Act notices "fails to indicate . . . who actually made the decision to close the mill without providing proper notice." 83 F.4th at 298. On remand, the district court based its decision, in part, on the purported lack of evidence about the events leading up to the issuance of the layoff notices on the morning of September 30:

> However, notably absent from the record in this case is any clear evidence of what actually occurred between the 25th and the 27th to change the WARN Act notice drafts from providing the 60-days required notice to causing the terminations

---

[17] The testimony of most witnesses, including the Independent Board Members, was entered into evidence through deposition, and thus the district court has no particular insight into the credibility of those witnesses.

effective immediately on September 30th, without the required 60-day notices. There was no testimony from any of the witnesses as to who decided that the plant would be closed without the WARN notices required by law.

*Fleming II*, 2024 WL 1621128 at \*3.

Problematically, however, there *was* evidence in the record about this issue. The deposition of Barney contains considerable information about the events leading up to the layoffs, as do the trial exhibits.

1.

Barney was at least in some discussion with Bayou Steel about actions that needed to be taken. Barney testified that she was told by CEO Williams, in a meeting with COO Davis, that the decision had been made to put the company into bankruptcy, and that her assistance would be required to "get[] everything accomplished."[18] Shortly thereafter, in an email dated September 25, Williams sent Barney and the Polsinelli and Candlewood professionals a message to establish contact so that Barney could "assist[] with next steps."

Barney appears to have been primarily in contact with Polsinelli and BDCM regarding the specific steps moving forward.[19] Barney testified that

---

[18] As mentioned above, CEO Williams testified that the evening of September 22, BDCM employee Hogarth called him, "to inform me that the board had elected to pursue bankruptcy filing." Similarly, COO Davis testified that BDCM employee Farahnak told him on September 19 that there would be a bankruptcy. Importantly, however, 1) no board vote to put Bayou Steel into bankruptcy occurred until September 30, and 2) the Independent Board Members all testified that the recommendation to put the company bankruptcy by the advisors, Polsinelli and Candlewood, was not made to them until the September 27 board meeting.

[19] While the record contains no conclusive evidence as to who was directing Polsinelli at this time, the record is unequivocal that the full Bayou Steel Board was not given the bankruptcy recommendation by Polsinelli until the afternoon of September 27. Of course a bankruptcy does not require layoffs (indeed, CEO Williams testified he thought it would be a reorganization, but in the course of preparing for the bankruptcy prior to the

she worked with Polsinelli counsel to craft the WARN Act notices and prepare non-disclosure agreements for upper management at Bayou Steel to sign. She testified that she had conversations with Polsinelli counsel and BDCM employees, Hogarth and Tanna, regarding the timing of the WARN Act notices.

The record shows that as early as September 26, Barney received an email from a Polsinelli labor attorney suggesting they would not be giving the requisite 60-day notice.[20]

Barney testified that initially she understood that WARN Act notices would go out on September 27, but was then directed by Polsinelli, Hogarth and Tanna to wait until September 30. When asked the reason to go with the latter date, Barney said "[T]here was some reason. There was a conversation that I was involved in between Polsinelli and Black Diamond related to timing . . . of the court filing, the WARN notice and the communication, and I don't recall why that was so significant, but there was a decision made to delay to September 30th." Barney testified that she believed Hogarth was on

---

September 30 board resolution, it is clear that 1) Polsinelli was not acting at the direction of the Bayou Steel management or the Independent Board Members, and 2) to the extent Polsinelli was providing direction to Barney about employment matters, that direction was also not coming from the Bayou Steel managers or the Independent Board Members. This leaves the BDCM employees as the parties directing Polsinelli, particularly Hogarth and Tanna, who Barney testified she *did* speak with. Moreover, Barney testified that she did not discuss the layoffs or the WARN Act notices with the Independent Board Members.

[20] Specifically, on September 26, the Polsinelli attorney emailed Barney:

To that end – should we delete the reference to the "layoffs" in the WARN letter and simply state that terminations of employees will begin at the end of the shift on September 25 for LaPlace. . . ? That certainly raises the WARN issue on the radar – as there wouldn't be 60 days' notice of an employment loss – but that is the reason why I asserted the 2 defenses [to WARN Act liability] in the first sentence of the notice.

the call, further affirming the fact that the timing and orchestration of the layoffs were in partnership with BDCM employees.

Nowhere in Barney's testimony does she state that any members of Bayou Steel's management were giving her direction to implement layoffs. The record shows that Barney emailed Bayou Steel managers with directives to provide her with employee lists, but nothing further. And critically, as the HR director, Barney would not have had authority to make this decision on behalf of Bayou Steel. Thus, the individuals she was in contact with are probative of who was giving direction.

Barney's testimony and the exhibits make clear that the layoff notices initially provided for 60-day notice but, inexplicably days later, the circulated draft no longer contained such notice. Barney's testimony further confirmed that she was in communication with Polsinelli and BDCM employees (but not any Independent Board Members) during this time and regarding this very topic.

2.

The emails about the timing and content of the WARN Act notices between Barney and Polsinelli were all before the Bayou Steel Board meeting at 3:00 p.m. on September 27, when Polsinelli first recommended filing a bankruptcy to the full Bayou Steel Board. No Independent Board Member was included on any of the emails with respect to the WARN Act notices or other bankruptcy preparations in the days between the September 22 approval to hire Candlewood and Polsinelli, and the September 27 board meeting at which a bankruptcy filing was first recommended to the Bayou Steel Board.

In contrast, it is clear the BDCM Board Members knew a bankruptcy would be filed. Hogarth, in particular, at this point was actively engaged with Polsinelli and Candlewood. But Bayou Steel, and the Independent Board

Members, were in the dark on the mechanics of the bankruptcy and layoffs.[21] Williams, then-CEO, testified that when he left Bayou Steel (his last day was September 26), he was under the impression the company would be reorganized, and that he was unaware there would be a mass layoff of employees. Davis, then-COO, testified unequivocally at trial that he had no control over the layoff decisions. He testified that, as of September 25, he understood employees would be getting 60-day notice. Davis also testified that the morning after Williams left (September 27), Barney informed Davis that the company would not be honoring the WARN Act, i.e., giving 60-day notice to employees. In response to this, Davis testified that he called Farahnak to discuss the lack of notice. When Farahnak did not answer, Davis texted him to tell him that it would be wrong not to honor the WARN Act and they needed to do something about it. These events are not contested in the record.[22]

*  *  *

The district court did not venture into the above evidence regarding both BDCM's involvement and Bayou Steel's lack of involvement. In particular, the district court did not explain why the directions Barney received from Hogarth, Tanna, and Polsinelli regarding the substance and timing of the layoff notices between September 25th and 30th were not

---

[21] Independent Board Member Archambault, whose testimony the district court found significant also testified that he had not understood there would be a mass layoff, because he thought the chapter 11 process was typically a restructuring.

[22] They also beg the question as to why the senior officer of Bayou Steel—Davis (the most senior Bayou Steel officer after Williams' departure)—would be calling a BDCM employee about the WARN Act notice issue if not for the fact that it was known and understood that BDCM controlled such decisions.

relevant to question of whether there was evidence of control over the notice and layoffs decision.

Bayou Steel was not making decisions independently through either its management or its board. Instead, BDCM was involved in discussions and decisions regarding the timing and notice of the layoffs—so much so that Bayou Steel's COO reached out to BDCM upon hearing there would be no WARN Act notice.

Polsinelli, the law firm the Independent Board Members understood was hired to advise the Bayou Steel Board about their options, was also working with Barney to prepare the layoff notices. The record contains evidence of Polsinelli communicating with the BDCM employees, but not the Independent Board Members. Barney testified that she communicated with Polsinelli attorneys and the BDCM employees but not the Independent Board Members. The bankruptcy preparations are closely linked to the layoff notices—yet neither the steps taken for bankruptcy nor the notices involved the Independent Board Members. This evidence further points to BDCM directing the layoffs rather than the Independent Board Members or Bayou Steel's management.

## V.

*Pearson* correctly recognized that "the DOL's caveat that the factors are a nonexhaustive list is intended to allow the factfinder to consider other evidence, if any, of a functional integration between the two nominally separate entities." 247 F.3d at 496. I underscore that understanding of the DOL test—and the present case evinces the importance of doing so.

Understanding of de facto control necessarily must go beyond evidence of a specific direction. The district court previously found that plaintiffs fell short of proving control because they had only shown "'smoke alone' without finding the 'fire'." *Fleming I*, 83 F.4th at 297 (quoting *Fleming*

*v. Bayou Steel BD Holdings II, LLC*, 2022 WL 503741 (E.D.La. Feb. 18, 2022)). That reading is too narrow. By that interpretation, a "specific direction" requires finding the singular spark that started the fire—when proving as much may be an impossible task. Instead, "specific direction" includes control sufficient to compel the subsidiary company to act; "specific direction" does not mean that where a plaintiff cannot get an admission from a defendant, the plaintiff loses.

Where, as here, a WARN Act defendant is both an affiliate and a lender, an analysis of both roles is required, and that must address the totality of the circumstances. And so too here, the totality of BDCM's acts—which include the equity distribution, the non-arm's length lending relationship, control of Bayou Steel's finances, operations and personnel, withholding of information from the Independent Board Members, exclusion of the Independent Board Members from decision-making, and direction of outside counsel and the HR manager in the lead up to the bankruptcy and layoffs—constitute the sort of "functional integration" showing "interfer[ence] with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership" and the overstepping of the line between "assum[ing] control of the borrower's business as a going concern rather than as a means to protect its security for repayment" that shows the entities did not operate at arm's length.

Bayou Steel was so controlled by BDCM that it lacked the ability to make any decisions, including the layoff decision, independently. The record shows the de facto control exercised by BDCM "was particularly striking," because it was "effectuated by 'disregarding the separate legal personality" of Bayou Steel. *Pearson*, 247 F.3d at 504 (quoting *Esmark*, 887 F.2d at 757). Under the facts of this case, this factor is "of such importance that 'liability [is] warranted even in the absence of the other factors.'" *Fleming I,* 83 F.4th at 299 (citing *Pearson*, 247 F.3d at 504).

No. 24-30291

The district court—understandably seeking to apply our remand directive in *Fleming I*—did not resolve all aspects of the control relationship between the parties, hence mistakenly narrowed the scope of WARN Act liability. For these reasons, I respectfully dissent.